IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES E. RIANO, R.N.,

      Plaintiff,

v.                                                    Case No. 11-CV-939 CNC

ERIC SHINSEKI, SECRETARY
DEPARTMENT OF VETERANS AFFAIRS,

      Defendant.

---

## PLAINTIFF'S AMENDED COMPLAINT

---

**NOW COMES** the above-named Plaintiff, James E. Riano ("Riano"), by and through his attorneys, Kohler and Hart, S.C., and as an amended complaint against the Defendant, hereby alleges and shows the Court as follows:

1.     Riano realleges and incorporates herein by reference hereto each and every allegation contained in paragraphs one (1) through eight (8) of the original attached complaint. (See Original Complaint dated October 7, 2011, attached hereto, marked as Exhibit 1 and incorporated by reference.)

2.     Riano was employed by the Department of Veterans Affairs at the Zablocki Medical Center as a registered nurse from August 2004 until his discharge on February 19, 2010.

3.     During the course of Riano's employment at the Zablocki Medical Center, a need arose for the Center to treat veterans returning from Iraq and Afghanistan for genital lesions.

4.     To meet that need, the Zablocki Medical Center, with the volunteered assistance of Riano, created the RN Special Clinic ("Clinic") to treat veterans with skin conditions of the genital and anal areas.

5. Riano was given permission to start the Clinic and was given control over it based upon his experience as a registered nurse and as a hospital corpsman in the U.S. Navy, where Riano had examined and treated patients with genital lesions.

6. Examining and treating veterans with genital lesions required Riano to view and manipulate veterans' genitals.

7. One patient reported his discomfort regarding Riano's practices to the Milwaukee Police Department.

8. After a thorough investigation and review by the Milwaukee County District Attorney's Office, no charges were filed against Riano.

9. Nevertheless, the Department of Veterans Affairs started an investigation into the claim made against Riano.

10. During the Department of Veteran's Affairs investigation into claims of alleged misconduct by Riano, Office of the Inspector General Special Agent Joe Cossairt ("Cossairt") was assigned to investigate Riano.

11. After Cossairt's investigation was completed, he submitted his findings to the Milwaukee County District Attorney's Office, which again declined prosecution.

12. During his investigation, Cossairt interviewed a number of Riano's patients.

13. Various patients interviewed by Cossairt complained about the investigation undertaken by Cossairt, and their complaints raise serious issues about the integrity of Cossairt's investigation. (See three (3) statements of complaining patients, collectively marked as Exhibit 2 and incorporated by reference.)

14. These complaining patients were later interviewed by Riano's then-attorney, Sally Stix.

2

15.    The complaining patients indicated, among other things, that Cossairt initiated his interview by explaining that Riano acted illegally.

16.    The complaining patients indicated that Cossairt asked them leading questions.

17.    The complaining patients indicated that Cossairt often asked and re-asked questions to get his preferred answer.

18.    The complaining patients indicated that Cossairt paid for their meals.

19.    The complaining patients also expressed discomfort that Cossairt asked whether they thought Riano was a homosexual.

20.    After Cossairt's investigation was completed, the Department of Veterans Affairs proposed that Riano be discharged from federal service on December 9, 2009.

21.    The Medical Center Director sustained the proposed removal on or about February 8, 2010.

22.    Riano timely appealed the decision to remove him from federal service and a Disciplinary Appeals Board ("DAB") was appointed.

23.    Riano was never given access to the names of the patients interviewed by Cossairt, even though he requested their names in order to gather more information.

24.    Under the section entitled "Determining the Facts," the VA Handbook 5021 (promulgated April 15, 2002), Part II, Chapter 1, Section 6 (a)(1)(c) provides, in pertinent part: "The resulting information will be documented.  Signed statements, preferably under oath, are the best form of documentation, and should be obtained, whenever possible, from employees interviewed."

25.    Cossairt did not obtain statements signed under oath from Riano's patients; instead, Cossairt wrote a written summary of his interviews with the patients.

26.     There is no indication that these interview summaries were reviewed by the individual patients for their accuracy or reliability.

27.     Because the patients were never identified or disclosed to Riano and there is no indication the patients actually reviewed the summaries written by Cossairt, their statements amount to no more than anonymous double hearsay.

28.     According to the VA Handbook 5021, Part II, Chapter 1, Section 6 (a)(1)(b): "Investigating officials will seek information concerning the matter from the employee(s) who is alleged to have committed the offense and from any other persons who may have pertinent information about the incident(s)." (emphasis supplied).

29.     No such inquiry was made of Riano by Cossairt.

30.     Part II, Chapter 1, Section 6 (a)(1)(d) provides, in pertinent part: "Evidence will be obtained impartially and an effort will be made to resolve any conflicting statements by developing additional evidence."

31.     In this matter, evidence was not obtained in an impartial manner.  As above, numerous patients complained that Cossairt initiated interviews by telling patients that Riano acted illegally, asked leading questions, often asked and re-asked questions to get his preferred answer, and paid for the patients' meals.

32.     The DAB rejected Riano's request to have the patients who complained about Cossairt's investigation testify on Riano's behalf at his hearing on March 22-23, 2011.

33.     The DAB also rejected Riano's request to have Dr. Barbara Wilson testify on Riano's behalf.

34.     The reason given by the DAB for denying Barbara Wilson's testimony was that she had no direct observation of Riano's practices.

4

35.     Nevertheless, numerous individuals were permitted to testify at Riano's hearing, even though he or she never directly observed Riano's practices.

36.     No one who directly observed Riano's practices testified at Riano's hearing.

37.     No patients treated by Riano testified at Riano's hearing.

38.     Riano's termination from federal employment was based entirely upon anonymous double hearsay, as no one with direct observation of Riano's practices ever testified, nor any of his patients.

39.     Rather, the DAB relied upon Cossairt's redacted written summaries of his interviews with various patients, which Riano asserted were, among other things, tainted by Cossairt's tactics.

40.     The DAB's decision to not permit the testimony of any of Riano's patients denied Riano his right to due process of law, in that he was unable to confront his accusers and that he was denied a meaningful opportunity to present a defense. *See McNeill v. Butz*, 480 F.3d 314, 325 (4 Cir. 1973).

41.     The DAB's decision to not permit the testimony of any of Riano's patients was also arbitrary, capricious, and in violation of the DAB's own procedures. According to a pre-hearing letter: "In determining the approval of witnesses the Board will review the nature of the testimony of each witness. Consideration will include the factors of relevancy, materialness, and repetitiousness." (See paragraph (e) of excerpt of January 14, 2011 Letter, marked as Exhibit 3 and incorporated by reference.)

42.     None of these factors appear to have been considered in determining whether Riano's proposed witnesses could testify. The complaining patients' testimony would have been relevant, material, and not repetitive.

5

43.     No standard of care for a position such as Riano's was ever established by the DAB during its hearing. (See Page 23, Line 10 of March 22, 2011 Transcript of Riano's DAB Hearing, marked as Exhibit 4 and incorporated by reference.)

44.     Nor was Riano ever put on notice prior to his removal that his standards of care and practices might give rise to his termination.

45.     Because Riano was never given notice of the alleged wrongfulness of his standards of care and practices prior to his termination, his removal from federal service was irrational and without basis.

46.     Riano was also denied access to information about the circumstances that led to purportedly similarly-situated individuals' termination from federal employment.

47.     By denying Riano an opportunity to compare purportedly similar circumstances that led to discharge from federal employment, the DAB acted irrationally and abused its discretion.

## COUNT ONE

48.     Riano realleges and incorporates herein by reference hereto each and every allegation contained in paragraphs 1 through 47 and in paragraphs 1 through 8 of the original complaint.

49.     The DAB's decision to terminate Riano was arbitary and capricious in that no standard of care was ever elucidated, Riano was not permitted to bring forth relevant and material witnesses to testify on his behalf, and that Riano was denied access to information about purportedly similarly-situated individuals terminated from federal employment.

50.     Accordingly, the DAB's arbitrary and capricious decision to terminate Riano should be set aside.

6

## COUNT TWO

51.      Riano realleges and incorporates herein by reference hereto each and every allegation contained in paragraphs 1 through 50 and in paragraphs 1 through 8 of the original complaint.

52.      The DAB's decision to terminate Riano was made without allowing Riano the opportunity to present a meaningful defense and after denying Riano his constitutionally-guaranteed opportunity to confront his accusers.

53.      The investigation into claims of misconduct by Riano was flawed and failed to follow procedures required by VA rules and regulations.

54.      Accordingly, the DAB's decision to terminate Riano was rendered without following procedures required by law, rules and regulations, and should be set aside.

## COUNT THREE

55.      Riano realleges and incorporates herein by reference hereto each and every allegation contained in paragraphs 1 through 54 and in paragraphs 1 through 8 of the original complaint.

56.      The evidence adduced against Riano at his DAB hearing consisted of anonymous double hearsay; therefore, the DAB's decision to terminate Riano is unsupported by substantial evidence and should be set aside.

**WHEREFORE**, the Plaintiff seeks the relief stated in his original attached complaint, including, but not limited to, reinstatement and back pay, and further requests that the Court set this matter for briefing.

Dated at Milwaukee, Wisconsin, this 2nd day of January, 2012.

KOHLER & HART, S.C.
Attorneys for James Riano, Plaintiff

7

/s/ Geoffrey R. Misfeldt
Martin E. Kohler
Wisconsin Bar No. 1016725
mekohler@kohlerandhart.com
Geoffrey R. Misfeldt
Wisconsin Bar No. 1065770
grmisfeldt@kohlerandhart.com

**P. O. ADDRESS:**
First National Bank Building
735 North Water Street, Suite 1212
Milwaukee, WI 53202
Phone: (414) 271-9595
Fax: (414) 271-3701

8

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES E. RIANO, R.N.,
W319N1049 Balsam Lane
Delafield, WI 53018

       Plaintiff,

v.                                    Case No.

ERIC SHINSEKI,
Secretary of Veterans Affairs,
810 Vermont Avenue NW
Washington, D.C. 20420
       Defendant.

---

## COMPLAINT

---

    **NOW COMES** the Plaintiff, James Riano, by and through his attorneys, Kohler and Hart, S.C., and complains of Defendant as follows:

    1.    This is an appeal from an administrative agency hearing and determination.

    2.    The Plaintiff, James Riano, is an adult resident of the State of Wisconsin who resides at W 319 N 1049 Balsam Lane, Delafield, Wisconsin 53018. Riano was a full-time permanent registered nurse appointed under 38 U.S.C. § 7401(1) and was employed by the Defendant until his discharge.

    3.    The Defendant, United States Department of Veterans Affairs, is an agency and division of the United States Government, with its headquarters located at 810 Vermont Avenue NW, Washington, D.C. 20420. The Department's Milwaukee, Wisconsin facility is named the Clement J. Zablocki Veterans Affairs Medical Center and is located at 5000 West National Avenue. Eric Shinseki is the Secretary of the Department of Veterans Affairs.

**EXHIBIT**

**1**

4. Jurisdiction and venue are based upon 28 U.S.C. § 1346(a), 38 U.S.C. § 7462(f)(1), and 5 U.S.C. § 702.

5. Plaintiff was employed at the Defendant's Zablocki Medical Center in Milwaukee, Wisconsin. On December 9, 2009, Plaintiff's discharge from federal service was proposed. That proposal was sustained by the Medical Center Director and the action effected on February 19, 2010.

6. Plaintiff timely appealed to the Veterans Administration's Disciplinary Appeals Board. On March 22 and 23, 2011, a hearing was held before an appointed Disciplinary Appeals Board. On July 1, 2011, the Board sustained the charges against Plaintiff and upheld the Medical Center Director's discharge decision.

7. By a letter dated August 22, 2011, the Principal Deputy Under Secretary of Health affirmed and executed the Disciplinary Appeals Board's decision. The Principal Deputy Under Secretary of Health's decision to execute the decision of the Disciplinary Appeals Board was the final administrative action in this action.

8. The decision by the Disciplinary Appeals Board and the Principal Deputy Under Secretary of Health to discharge Plaintiff's employment is unsupported by substantial evidence, is arbitrary, capricious, an abuse of discretion, violates the Plaintiff's due process rights, and is otherwise illegal. The decision was also rendered without procedures required by laws, rules, or regulations having been followed.

**WHEREFORE**, the Plaintiff seeks the following relief:

1. An order setting aside and declaring unlawful the Department of Veterans Affairs' decision to discharge Plaintiff.

2

2.   Reinstatement with full back pay, front pay, medical coverage and benefits, seniority, and prejudgment interest;

3.   Attorneys fees and costs of suit; and

4.   Any other remedies the Court deems just and equitable under the circumstances.

Dated this 7th day of October, 2011 at Milwaukee, Wisconsin.

KOHLER & HART, S.C.
Attorneys for James Riano, Plaintiff

_s/_ Geoffrey R. Misfeldt_____
Martin E. Kohler
Wisconsin Bar No. 1016725
Geoffrey R. Misfeldt
Wisconsin Bar No. 1065770

**P. O. Address:**

First National Bank Building
735 North Water Street, Suite 1212
Milwaukee, WI 53202
Phone:  (414) 271-9595
Fax:  (414) 271-3701

3

I, ▆▆▆ A▆▆▆ reviewed the memorandum of interview compiled by investigator Joe Cossairt on October 23, 2008. Mr. Cossairt has misrepresented several of my responses in his report. I will respond to each paragraph individually. Cossairt correctly reported my age, height, and weight at the time. Cossairt correctly reported that I was able to review my affidavit and that I was contacted by Riano's attorney.

Cossairt correctly reported my previous experiences with examination and treatment of my medical condition. I further believe the other clinicians did their patients and me a great disservice, as the "minimal genital touching" treatments were not as thorough and effective as Riano's. I believe they should have conducted examinations similar to Riano's. Treatments I have received from medical professionals prior to and since Riano fail to fully treat my condition, as many lesions are missed, and require me to repeat treatments within days. That compared with Riano's treatments which allowed me to go weeks between them. A thorough exam should be conducted each time, even if that requires clinicians to "double and triple check" for accuracy. The most recent treating clinician put forth no effort to efficiently treat my condition, and even failed to treat warts I was able to see. The clinician's treatment was so ineffective I refuse to be treated by him, again.

Cossairt correctly reported my dissatisfaction with other health care providers lack of concern and efficiency. Cossairt also correctly reported that other providers never informed me I need an erection to receive treatment, however he omitted that Riano never told me I need an erection, either. Increase in blood flow to the penis is wholly different than an "erection." There is no arousal associated with increased blood flow. The increased blood flow assists with stretching the skin which makes small or "hidden" warts easier to see. I repeatedly informed Cossairt of the difference, however he failed to include that in his report.

While I only needed five to ten appointments with Riano, I now need nearly double the number of appointments, and the treatments are not nearly as effective, even with the increased volume. Cossairt incorrectly reported the majority of my appointments occurred with me lying on an examination table. I have been examined both lying down and standing on numerous occasions. Position was determined by the location of the warts, and which position allowed optimal accessibility. Cossairt correctly reported Riano examined my anal area which is imperative for thorough treatment of genital warts.

Cossairt correctly reported my request to check my penis for discharge, and Riano indicated an examination may be more thorough if the skin is fully stretched.

1

EXHIBIT
2

However, Cossairt incorrectly reported, "Riano gave the impression that this meant his penis would be easier to examine if it was larger." The size of my penis had absolutely no bearing on the efficiency of an exam. Riano explicitly stated, as Cossairt reported in this paragraph, the thoroughness of an exam is directly linked with the skin being "fully stretched." I am unaware of the basis of Cossairt's opinion that Riano associated treatment with penis size. I never indicated to Cossairt that Riano was concerned in any way with "penis size."

Cossairt incorrectly reported that Riano "massaged" my penis "similar to masturbation but not exactly." I never told Cossairt that Riano did any of those things. Cossairt was, in fact, the person who used the terms "massage" and "similar to masturbation" and attempted to elicit my agreement. I specifically informed him those words were "not exactly" the best way to describe the procedure during treatments. I further informed Cossairt that I was unable to describe these things, but "massaging" and "similar to masturbation" are definitely not the terms I would use to describe the procedure. I indicated to Cossairt that Riano applied pressure in an attempt to increase blood flow to my penis to stretch the skin, Riano never indicated his goal was for me to achieve a full erection. Riano applied nivea cream to my penis because my skin was very dry, and I needed it. Cossairt misreported the circumstances surrounding Riano's discussion of other patients. Riano was professional at all times, and never initiated discussions regarding his treatment of other patients. The discussion came about because I initiated it by asking Riano if he had ever had a "close call" while treating any patients. Riano remained professional when he informed me he had some "accidents," but he did not go into any detail.

I recall at least one occasion when the female staff member was present during the entire treatment.

Cossairt correctly reported that Riano did not receive sexual gratification from manipulating my penis.

Cossairt grossly misreported nearly every detail in this paragraph. I was never given Riano's statement to read. The only information I was given to read was my affidavit and statement. Even if Cossairt had shown me this statement, I would fully concur with it. Riano never "stroked my penis until it became erect." Similarly, he never indicated that my penis needed to be "erect" in order for him to treat my condition. Riano always thoroughly explained the treatment procedure. Furthermore, he never "stroked" my penis. He strategically manipulated and applied pressure in order to increase blood flow and stretch the skin of my penis. In addition, Riano made it clear the increased blood flow which stretched penile skin was not a mandatory, but

Case 2:11-cv-00939-CNC   Filed 01/02/12   Page 13 of 19   Document 8

permissive, procedure in the treatment. Riano fully explained that fully stretched penile skin allowed him to see small or hidden warts he might not otherwise see. Riano further indicated that if I did not feel comfortable with that portion of the procedure, manipulation to increase blood flow to my penis is optional, I could choose not to have it. He is the only provider who has treated all my genital warts at every appointment.

Cossairt correctly reported that Riano never attempted to pursue a relationship with me. He remained professional at all times. He did contact me to speak with his attorney. He also correctly reported my sentiments of health care providers I've seen since Riano was removed. I would like to add, that I would feel most comfortable if Riano were allowed to return to the VA. He is the most thorough and efficient health care provider I've seen to date.

Another point of concern regarding the interview is that Cossairt was emphatic about me responding in certain way to inflammatory questions. Whenever I responded in a manner inconsistent with what I believe he wanted, he would request I re-explain my response, or he re-asked the same questions in a different way.

I affirm all the information above is true and correct to the best of my recollection.

_A_

_1-15-10_
Date

3

Statement of ██ M███ M2

I reviewed the report from the Office of the Inspector General agent summarizing my interview regarding the health care I received from Jim Riano, RN, who treated me while I was a patient at the VA Dermatology Clinic from Fall 2007 until early 2008. After I received the initial survey OIG Agent Cossairt, I called him to ask about the charges. I was leery about the allegations against Jim and I thought money could be, at least a partial motivating factor. I asked Cossairt if money was involved in the charges, and he told me if Riano is found "guilty," then his patients, me included, could receive financial compensation. Cossairt also informed me, during the telephone conversation and during the interview that what Riano did was illegal. That contradicted Cossairt's original statement to me that the purpose of the investigation was to assist in getting the truth. The interview was consistent with Cossairt's predetermination of Riano's guilt. During the interview, Cossairt sought information supporting his theory of Riano's guilt.

I felt pressured when OIG interviewed me. First, Cossiart only gave me two options for location of the interview, my home or the VA police station. I did not feel comfortable with him coming to my home, and he insisted we meet at VA police station where we could be alone without anyone interfering. Meeting in a police station at the VA which made me feel very uncomfortable, as if I were a criminal or had done something wrong.

During the interview, the agent was persistent about me responding to his questions in a certain way. If I did not respond supporting any wrongdoing, he would continue to ask questions in different ways in what appeared to me to be an attempt to elicit responses he wanted. However, I was very clear in answering questions.

In several instances in the report, Cossairt misrepresented my answers, or took them out of context. In the first full paragraph of page two the report indicates that my consent to the Riano's exam was "pretty voluntary." My consent to the exam was completely voluntary. I have a reasonable idea of what medical procedures are and are not appropriate. If I felt Riano had ever conducted himself inappropriately, I would not have continued to allow him to treat me and I would have reported him. I also noticed throughout the OIG report, beginning on page two, the term "weirded out" was used to describe my reaction to Riano's procedure. I said that when Jim initially told me what the procedure consisted of, I was "weirded out." However, when Jim more thoroughly explained the procedure, it made sense and I was comfortable. I discussed this in detail with Cossairt, however in his report, he misrepresented me.

In the last paragraph on page two, Cossairt, again, misrepresented my responses. First, I never referred to Riano's hand motions as "jerk off motion." Also, I stressed to Cossairt that Riano was not being inappropriate, at any time, during any of the examinations. In the same paragraph, Cossairt also indicated that I felt like "Riano was implying [I] had problems getting an erection." That is not true. I was aware of the reason why Riano felt my penis needed more blood flow. I did tell Jim that I was unable to increase blood flow to my penis on my own during the exams because of the

people were most likely motivated by money, because I fully believe that everyone was satisfied with the care Riano had given them and Riano had never behaved in a way that was inappropriate or unprofessional. I never stated in any way that I was confused about Riano's actions or intentions. I do not recall saying anything even remotely related to that. I was only confused about the motives of Riano's accusers. I was very clear about Riano's actions and intentions.

I am also aware one of the charges against Riano is based, in part, on my experiences and interactions with him. However, I would like to reiterate my conviction that while I was his patient, Riano never did anything unprofessional or inappropriate. I do not want Riano's treatment of me as a basis for the VA disciplining him.

_____     m2

1-18-2010
Date

I reviewed the report from the office of the Inspector General summarizing my interview regarding the health care I received from Jim Riano, RN, who treated me while I was a patient at the VA Dermatology Clinic from Fall 2007 until early 2008. I am also aware one of the charges against Jim Riano is based, in part, on my experiences and interactions with him. However, I would like to reiterate my conviction that while I was his patient, Jim never did anything wrong or inappropriate. I do not want to see Jim's treatment of me as a basis of the VA disciplining him. As I stated in my written response to the OIG agent, which he omitted from his report, "I would just like to say that the staff member was always professional, and seemed to always have my best interest in mind when administering treatments. I don't feel violated at all."

I have additional problems with the OIG's interview including, his interview process which was intimidating. It also seemed like the OIG inspector after asking a question and hearing the answer would reshape the answer I had given him to fit what he thought it should sound like.

W1

_1/18/10_
Date

express mail to the individuals serving on or in support of the Board as listed in paragraph 1 above and the appellant. All copies of the evidence file should be tabbed and indexed, and must be received by all parties no later than January 20, 2011. Addresses for the Board members, TA and the appellant and appellant's representative are provided in the enclosure.

3. **Arrangements for the Hearing**: The hearing will take place at your facility. Please arrange for suitable hearing space and inform all parties of the specific location at the time that you submit the evidence file. Generally, hearings last two to three days; therefore, in arranging for suitable hearing space this timeframe should be considered. It will also be necessary for you to arrange for the services of a court reporter. Because of the restricted time requirements of this procedure, expedited receipt of transcripts is required. The original transcript must be delivered to the Technical Advisor and copies must be delivered to each DAB member by the transcription company with arrival no later than close of business February 15, 2011.

4. **Procedural Matters**:

a. **Serving documents**: All documents, motions and other correspondence filed with the Board should be filed with the Board Chairperson and the Board Technical Advisor. In addition, parties to a proceeding must serve all documents, motions, and correspondence on each other, in accordance with the timeframes specified in this notice.

b. **Presentation of Cases**: At this hearing both parties will have the opportunity to present their cases through the examination of witnesses and the introduction of evidence. Opening and closing statements are also permitted.

c. **Designation of Representative**: Designation of your representative must be faxed to me no later than January 19, 2011.

d. **Pre-hearing Motions or Other Requests**: If you have any pre-hearing motions or other requests, they must be received by me no later than January 21, 2011. Responses to motions must be received by me no later than by January 26, 2011.

e. **Witnesses**: Once you have determined who your witnesses will be, forward a list of their names and a brief statement of the nature of their testimony to the employee and his/her representative, as well as to me and the Board's Technical Advisor. This list must be received not later than January 26, 2011. Objections to any witnesses must be received by me no later than January 28, 2011. In determining the approval of witnesses the Board will review the nature of the testimony of each witness. Consideration will include the factors of relevancy, materialness, and repetitiousness. The Chairperson has the final authority to determine the acceptability of any witnesses.

f. **Settlement Discussions**: It is expected that both parties will discuss settlement possibilities. A written summary of any settlement discussions must be provided to each board member and the Technical Advisor no later than January 26, 2011.

g. **Pre-hearing Conference**: A pre-hearing teleconference is scheduled for January 28, 2011 at 1:00 p.m. Central Time. This conference will involve a discussion of the facts and issues of the appeal including appellant defenses, any timeliness or jurisdictional issues, motions, objections to witnesses, possible stipulations, and any other administrative issues which are pending.

**EXHIBIT**

**3**

1     MS. KAISER: I would like to offer Dr.
2  Aughenbaugh as an expert in the field of dermatology
3  at this time.
4     CHAIRPERSON KERKHOFF: So noted.
5     BY MS. KAISER:
6  Q  Dr. Aughenbaugh, can you explain your process for
7  examining a male patient with genital warts?
8  A  So I standardly have them gowned when I come into the
9  room.  I introduce myself.  I take a history, give
10  them some basic information about how the -- how I
11  will be conducting our visit.  And then I typically
12  start by having them show me the area of concern.  I
13  try to pay attention to their comfort level and show
14  me exactly the spots that they've -- they are
15  concerned about.  I then examine them and typically
16  have them get dressed -- have them cover up, talk
17  about treatment, and then go ahead with the treatment.
18  Q  What type of treatment is typical for this kind of
19  condition?
20  A  So the most standard treatment would be liquid
21  nitrogen or cryotherapy, which is just freezing the
22  warts with a cold spray.  It causes them to blister.
23  The blister falls off, and oftentimes the warts are
24  treated.  Warts are tough to treat because they take
25  -- may require multiple visits.  So we sometimes give

1  them home treatments to try.  I often bring them back
2  for follow-ups.  And there are other -- a variety of
3  treatments if that didn't work.  The standard
4  treatment would be that.
5  Q  In your opinion is that a relatively simple condition
6  to treat?
7  A  Yes.
8  Q  Okay.  Are you aware of any specific protocols for
9  treating or examining patients with genital warts?
10  A  None exist.
11  Q  Okay.  And when you begin an examination, you say that
12  you ask the patient to show where the problem area is.
13  But is it also true that you need to actually look at
14  the patient's genitals in order to determine if there
15  are any other problems?
16  A  I basically start with them showing me the area of
17  concern to them, and then I will conduct an extra exam
18  looking through the pubic area at the scrotum through
19  the thighs, just making sure we're not missing
20  additional spots.
21  Q  How long does this type of examination typically take?
22  A  Just the exam?
23  Q  Correct.
24  A  A minute -- one to two minutes.  And then there's
25  obviously some additional treatment then -- the actual

1  treatment or cryotherapy.
2  Q  How long does the treatment then take?
3  A  About the same, one to two minutes.
4  Q  Overall the time that a patient may be exposed to you
5  would be approximately how long?
6  A  On the first visit it would be longer because there's
7  a lot of counseling that takes place about
8  transmission of warts, risk to female partners.  On
9  all the follow-up visits it is typically five minutes
10  or less.
11  Q  Okay.  Doctor, can you explain if you need a firm
12  surface on the penis to examine and treat genital
13  warts?
14  A  Generally not.  Sometimes to try to -- if there's any
15  questions, you might gently stretch the skin, but
16  generally that's typically not needed.
17  Q  So would it be required to have any kind of increased
18  blood flow in order to treat or examine genital warts?
19  A  No.
20  Q  Can you explain why not?
21  A  The warts generally are visible without that being
22  necessary, and stretching the skin accomplishes the
23  same goal in my opinion.
24  Q  Do you use any kind of magnifying tools in order to
25  see small warts?

1  A  Yes.
2  Q  Doctor, if you can, explain what is a definition of an
3  erection -- a medical definition of an erection.
4  A  Increased blood flow to the penis.
5  Q  Okay.  Would an erection be beneficial in examining or
6  treating genital warts?
7  A  I don't think it's necessary.
8  Q  And --
9  A  To accomplish the goal of identifying warts.
10     MS. STIX: I'm going to object.  It was
11  non-responsive.
12     BY MS. KAISER:
13  Q  Doctor, is it fair to say --
14     CHAIRPERSON KERKHOFF: We're just going to
15  have -- sustain the objection.
16     BY MS. KAISER:
17  Q  Doctor, is it fair to say an erection isn't necessary
18  for a genital wart examination?
19     MS. STIX: I'm having a very hard time
20  hearing Erin and the doctor with --
21     MS. KAISER: I apologize.  I don't know if
22  it would be beneficial for the doctor to move his
23  chair up.
24     (A brief discussion was held off the record.)
25     BY MS. KAISER:

EXHIBIT
