IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JAMES E. RIANO, R.N.,

     Plaintiff,

v.                                   Case No. 11-CV-939 CNC

ERIC SHINSEKI, SECRETARY
DEPARTMENT OF VETERANS AFFAIRS,

     Defendant.

---

## PLAINTIFF'S OPENING BRIEF

Pursuant to the Court's scheduling order, the Plaintiff, James E. Riano ("Riano"), by and through his attorneys Geoffrey R. Misfeldt and Martin E. Kohler of KOHLER & HART, S.C., hereby submits his opening brief:

### STATEMENT OF FACTS

### *PRE-ALLEGATIONS*

1.     In August of 2004, Riano began his employment as a registered nurse with the Department of Veterans Affairs at the Zablocki Medical Center in Milwaukee, Wisconsin. (Def.'s Answer to Am. Compl.; Docket R.12, page 4.)

2.     Riano was, by all accounts, a valued member of the Milwaukee VA. (See Admin. R. from 79-112.)  In his Nurse II proficiency report, Riano exceeded all possible standards for qualifications, functionality, competency, and quality of care.  (Admin. R. at 82-85.)  On April 3, 2007, Riano was promoted to Nurse III.  (Admin. R. at 79.)  Within his assessment, Riano received exemplary marks for both "us[ing] professional standards of care . . ." and for

"provid[ing] leadership in the application of the nursing process to client care . . ." (Admin. R. at 79.)

3.     During the course of Riano's employment, a need arose for the Center to treat veterans for genital lesions, especially those veterans returning from Iraq and Afghanistan. (Admin. R. at 79.)   The Zablocki Medical Center therefore created the RN Special Clinic ("Clinic") in the summer of 2007 to treat veterans with skin conditions of the genital and anal areas.  (Id.)  Riano was given permission to start the Clinic and was given control over it.  (Page 2 of Comprehensive OIG Report, Admin. R. at 223.)

### THE ALLEGATION

4.     On January 31, 2008, M1, a patient who had been seen by Riano on a number of occasions, spoke with a detective from the Milwaukee Police Department about Riano.  (1/31/08 Milwaukee Police Department Report; Admin R. at 240-253).  M1 had spoken to at least two law firms about Riano and was told by a firm that they would not take his case unless he filed a police report, because his case "sounded like a 'difficult case to prove.'"  (Admin. R. at 247.)  M1 reported to the police that he had ejaculated during his treatment with Riano, and although this made him uncomfortable, M1 continued to schedule and attend treatments with Riano.  (See Admin R. at 243-248.)

5.     In his interview with police, M1 made a number of unusual references about Riano's sexuality and M1's own struggles.  "[M1] stated that, ever since the first visit, he has believed that Jim Riano is a homosexual . . . "  (Police Report; Admin. R. at 242.)  "[M1] stated that he did not want to watch precisely what Jim Riano was doing to his penis, because he was 'uncomfortable' with the idea that a man was making him feel that way . . . "  (Id.; Admin. R. at 243.)  After one alleged incident, "[M1] stated that he was upset because '[he was] thinking it's

2

wrong,' but there was a physical part of him that had felt 'good.'" (Admin. R. at 243.) Similarly, "[M1] said during [another] incident, a part of him was thinking that 'it felt good, regardless of whether it was a man or a woman,' but the physical sensation was not something that he wanted because he is not a homosexual, but rather is a married, Christian man." (Admin. R. at 243.) Lastly, "[M1] stated that viewing of adult heterosexual female pornography and masturbation were it 'as far as any sexual addictions [he's] had,' and that he has been doing well with his internal personal and spiritual struggle against them . . ." (Admin. R. at 244.)

6.     Once the Milwaukee Police Department completed its investigation into the allegations raised by M1, the matter was referred to the Milwaukee County District Attorney's Office for prosecution. The District Attorney's Office declined prosecution.

### THE OFFICE OF THE INSPECTOR GENERAL'S INVESTIGATION

7.     After the District Attorney's Office declined prosecution, the Department of Veterans Affairs started its own investigation into the claim M1 made against Riano. Office of the Inspector General Special Agent Joe Cossairt ("Cossairt") was assigned to investigate Riano. Agent Cossairt began his investigation by sending out a questionnaire to nearly 50 patients. (OIG Questionnaire, Admin. R. at 297; see also Comprehensive Report of Investigation; Admin. R. at 222.) Cossairt's questionnaire was suggestive in a number of ways, first by telling patients that they "might possibly be a victim of inappropriate conduct by a member of the clinic's staff." (Admin. R. at 297.) The questionnaire itself contained many suggestive questions, like: "Did any staff member tell you your genitals needed to be erect in order to be examined and/or treated?" (Id.)

3

8.     To further taint the investigation, the Inspector General contacted patients who were not cooperative or did not think Riano did anything wrong and advised them that they could sue the VA.  (January 18, 2010 Statement of Patient M2; Admin R. 202-203.)  Patient M2 wrote:

> I was leery about the allegations against Jim [Riano] and thought money could be, at least a partial motivating factor.  I asked Cossairt if money was involved in the charges, and he told me that if Riano is found 'guilty,' then his patients, me included, could receive financial compensation.  Cossairt also informed me, during the telephone conversation and during the interview that what Riano did was illegal.

(Admin R. at 202.)  Patient M2 further stated that in Cossairt's report, Cossairt "misrepresented my answers, or took them out of context."  (Id.)  For example, in Cossairt's memorandum of his interview with M2, Cossairt wrote that M2 stated Riano made hand gestures, which M2 allegedly described as a "jerk off motion."  (Mem. of October 22, 2008 Interview with M2; Admin R. at 393.)  M2 stated unequivocally: "I never[1] referred to Riano's hand motions as 'jerk off motion.'" (Admin R. at 202.)

9.     Like patient M2, patient S1 expressed concern that Cossairt began his interview by telling S1 that what Riano did was illegal.  (Admin. R. at 195.)  S1 was also distressed that Cossairt paid for his meal.  (Id. at 196; see also Def.'s Answer to Am. Compl. at 8.)

10.     Other patients reported similar concerns about the investigation undertaken by Cossairt.  For example, in Cossairt's memorandum of his interview with A1, Cossairt reported that A1 told him that "Riano would then 'massage' A1's penis, squeezing the shaft and using

---

[1] Even though M2 complained that Cossairt's report misrepresented his answers or took them out of context, the Disciplinary Appeals Board found Cossairt's report true and credible. (Disciplinary Appeals Board Decision; Admin. R. at 19.)  Perhaps more interestingly, M2 made himself available for two interviews with Cossairt and provided two statements to Riano's attorney, yet was not permitted to testify before the Disciplinary Appeals Board because of patient privacy.  (Summary of March 8, 2011 Pre-Hearing Conference Call; Admin. R. at 149-151.)

motions 'similar to masturbation, but not exactly.'" (Cossairt's Mem. of October 23, 2008 Interview with A1; Admin. R. at 414.) However, patient A1 said: "I never[2] told Cossairt that Riano did any of those things. Cossairt was, in fact, the person who used the terms 'massage' and 'similar to masturbation' and attempted to elicit my agreement." (January 15, 2010 Statement of A1; Admin. R. at 200.) A1 further complained about the veracity of Cossairt's memorandum of their interview: "Cossairt grossly misrepresented nearly every detail in this paragraph [of the memorandum of interview]. I was never given Riano's statement to read. The only information I was given to read was my affidavit and statement. Even if Cossairt had shown me [Riano's] statement, I would fully concur with it." (Id.; Admin. R. at 200.) Furthermore, A1 complained that Cossairt "was emphatic about me responding in a certain way to inflammatory questions. Whenever I responded in a manner inconsistent with what I believe he wanted, he would request that I re-explain my response, or re-ask the same questions in a different way." (Id.; Admin. R. at 201.)

11.     Patient W1 echoed A1's concerns about Cossairt's coerciveness, saying that Cossairt's "interview process . . . was intimidating. It also seemed like the OIG inspector after asking a question and hearing an answer would reshape the answer I had given to fit what he thought it should sound like." (January 18, 2010 Statement of W1; Admin. R. at 204.)

12.     Agent Cossairt also asked Riano's patients whether they thought Riano was a homosexual. (Def.'s Answer to Am. Compl. at page 8.)

---

[2] Although A1 stated that he never used the terms "massage" or "similar to masturbation. . ." in his interview with Cossairt, the Disciplinary Appeals Board accepted Cossairt's memorandum of this interview as true. (Admin. R. at 21.) "The investigator documented that the patient stated in quotes . . ." (Id.) In spite of the glaring inconsistency between A1's written statement and Cossairt's recollection of his interview with A1, the Disciplinary Appeals Board "conclude[d] that manipulation did occur and that it was inappropriate." (Admin. R. at 22.)

5

13.    The Adminstrative Record is rife with references to homosexuality.  (See Admin. R. at pages 24, 188, 217, 242, 243, 261, 270, 301, 314, 316, 323, 328, 329, 335, 342, 347, 351, 361, 363, 368, 377, 403, 424, 430, 484, 561, 623.)   Of course, most of Riano's patients[3] interviewed by Cossairt denied any homophobic bias, stating things like: "[T1] . . . does not have any negative feelings towards homosexuals, and . . . homosexuals are among his tenants at rental properties he owns."  (Admin. R. at 323.)  "[D1] immediately assumed Riano was a homosexual due to his voice and hand gestures and the fact that he came across 'as very effeminate.'  [D1] reported that he has no feelings about homosexuals."  (Admin. R. at 328.)  "[D1] . . . assumed Riano was gay and did not want to be unfairly accused of being anti-homosexual or a 'gay basher.'"  (Admin. R. at 329.)  Likewise, C1 "believed Riano was possibly a homosexual based upon the way he talked and acted.  [C1] reported no strong feelings against homosexuals and stated he has friends who are gay."  (Admin. R. at 335.)  W1 "has not made a determination as to whether or not he believes Riano is a homosexual.  [W1] further stated that he has no feelings against homosexuals; he has friends who are homosexuals and does not care if Riano is or is not homosexual."  (Admin. R. at 342.)  F1 "believed Riano was gay based upon his speech and mannerisms, but has no feelings against homosexuals.  [F1] is an actor at the University of Wisconsin in Milwaukee, and has many gay friends."  (Admin. R. at 347.)  Similarly, G2 "thought Riano might be a homosexual based upon his speech and actions, but this did not bother [G2], as he has no feelings against homosexuals."  (Admin R. at 351.)  "For no specific reasons, [F2] had the general impression that Riano was a homosexual.  [F2] has no feelings against homosexuals."  (Admin. R. at 361.)

---

[3]  For reference, openly homosexual individuals were prohibited from serving in the (continued…) military until  2011.  *See* 10 U.S.C. § 654 (2010).

6

14.     Nevertheless, at least one of Riano's patients did not conceal his homophobic biases: "[G1] wondered why the VA allowed a man he believed to be a homosexual to treat other men for genital warts without a third party in the exam room."  (Admin R. at 316.)

15.     G1's statement exemplified concerns about homophobia existing among male Veteran patients whose genital examinations were conducted by a male nurse.  Patient F2 said: "Perhaps someone who is inclined to be 'homophobic' would be offended or shocked by [Riano's] treatment . . ."  (Admin. R. 363.)   Michael Williams, R.N., who had conducted exams and taught on the subject of providing male genital exams, stated that, in his experience, he "was struck deeply by the discomfort (homophobia) of many male patients towards nurses who happen to be men."  (Admin. R. at 270.)  Similarly, Dr. David Eilers, M.D., in responding to Cossairt's inquiry about the alleged wrongfulness of Riano's conduct, prefaced his answers by stating: "I realize that the sensitive nature of this case may shape people's responses and that the actions of the provider may be misconstrued.  Also, there may be a potential bias against homosexuals . . ."  (Admin. R. at 430.)

16.     In addition to other tainted aspects of Cossairt's investigation, there is no indication that the summaries of Cossairt's unsworn interviews with patients were reviewed by the individual patients for their accuracy or reliability.  (See Def.'s Answer to Am. Compl. at page 10.)

17.     After Cossairt's investigation was completed by June of 2009, Cossairt submitted his findings to the Milwaukee County District Attorney's Office, alleging that Riano assaulted five victims.  The District Attorney's Office again declined prosecution.

18.     After interviewing most of Riano's patients that returned his suggestive questionnaire, Cossairt provided copies of his memoranda of interviews to Dr. David Eilers, the

7

Chief of Dermatology at Hines VA Hospital. (Admin. R. at 430.) Eilers considered the materials Cossairt provided and rendered his conclusions about the wrongfulness of Riano's alleged conduct. (Admin. R. at 432-433.) Several aspects of Eilers commentary are noteworthy, including, as above, that Riano's patients may be harboring biases against "homosexuals, or even the government." (Admin. R. at 430.) For example, Eilers said:

> I am not familiar with the technique or need to apply pressure at the base of the penis to provide a firmer surface. That very well may be a described technique. I however am not aware of it. **I do think someone could probably rationalize that a firmer surface could be more readily examined. My guess is that is probably is a described, albeit uncommonly applied technique**, and I don't think it is necessary in doing the skin exam. It certainly is not part of the standard of practice, though it may have been part of nurse Riano's training.

(Admin. R. at 430-431.) (emphasis added.) Eilers further noted: "some appropriate techniques may be misinterpreted by the patients as being sexual in nature. These techniques may be affected by people's past experiences, sexual orientation, etc." (Admin. R. at 431.) Although Eilers stated that Riano's conversations with patients were sometimes "crude and unprofessional," he noted that "providers have different styles, and ways of making patients feel comfortable with the examination process." (Admin. R. at 432.) Eilers prefaced his conclusions by saying: "I think the only question is the veracity of the testimonies . . ." (Id.)

19. Eilers had four general conclusions based on Cossairt's inquiries. First, Eilers concluded that it was not "medically necessary" for a patient to have an erection to treat genital warts, but stated that genital warts "may be more easily identified if the male patient is in an erect or semi-erect state." (Admin. R. at 432.) Second, Eilers concluded that he was "not aware of it ever being medically appropriate to manipulate the penis with [intent to cause enlargement or any degree of erection]." (Admin. R. at 432.) Third, Eilers concluded that the proper protocol

8

if a patient experienced an erection during an examination would be to "try not to draw too much attention to the fact, and continue the exam normally." (Admin. R. at 433.) Eilers was not sure how to approach a situation where a patient ejaculated. (Id.) Fourth, Eilers concluded that Riano's actions and statements were outside the standards of care "as far as [he] knew or [was] concerned." However, Eilers acknowledged that "each person's approach to patients is different, and certainly there can be some potential awkwardness with the genital examination by both patient and medical provider. Some comments may be made to make a patient feel more comfortable to help them relax." (Admin. R. at 433.)

### THE VA PROPOSES RIANO'S DISCHARGE

20.    After considering Cossairt's investigation and Dr. Eiler's conclusions, the Department of Veterans Affairs proposed that Riano be discharged from federal service on December 9, 2009, alleging 19 specifications of inappropriate manipulation of patients' genitalia and 15 specifications of making unprofessional comments during examinations or treatment.

21.    On December 15, 2009, Riano's prior counsel requested the names of the complaining patients that formed the basis for his proposed discharge. (Admin. R. at 208.) As of January 18, 2010, Riano did not know the identities of patients H1, G1, D1, C3, W2, P, T2, and S1. He guessed at the identity of patient C1. (1/18/10 Response to Proposed Discharge; Admin. R. at 190-192.)

22.    By a memorandum dated February 5, 2010, the Manager of the Great Lakes Human Resources Management Service conducted an analysis of the so-called *Douglas*[4] factors as it pertained to Riano's conduct. In contradistinction to the District Attorney Office's decision

---

[4] *Douglas v. Veterans Admin.*, 5 MSPB 313 (1981) established a number of factors that must be considered in determining what adverse action to take or what penalty to impose upon a federal employee.

not to prosecute, the author of the memorandum concluded that "Riano's actions were clearly intentional, and it appears that his actions provided him with personal gain due to the enjoyment or personal gratification that he most likely derived." (Admin. R. at 495.) The Medical Center Director sustained the proposed removal on or about February 8, 2010.

23.     Riano timely appealed the decision to remove him from federal service and a Disciplinary Appeals Board ("DAB") was appointed on December 14, 2010. (Admin. R. at 131.) On January 24, 2011, the DAB hearing was scheduled for March 22, 2011. (Admin. R. at 139.)

### PRE-HEARING PROCEEDINGS

24.     To prepare for Riano's defense, on January 27, 2011, Riano's former counsel asked for the names of the patients identified in Riano's proposed discharge, access to their medical records, and for the VA Clinic's protocols. (Admin. R. at 43.) On February 22, 2011, Riano filed a motion for production of the same documents requested in his January 27, 2011 letter. (Admin. R. at 45-48.)

25.     On February 25, 2011, the DAB denied Riano's motion to know the names of his former patients and his motion to review the records of the complaining patients. (Admin. R. at 144.)

26.     On March 1, 2011, Riano filed his witness list. (Admin. R. at 50.) Riano named himself, six former patients, one co-worker, an expert witness, two doctors to testify about establishing the Clinic, one doctor to testify about Riano's practices, and a former Navy Corpsman who trained with Riano. (Admin. R. at 50-51.) Among the six former patients were those who expressed concerns about the veracity and bias of Cossairt's investigation. The VA submitted its witness list the same day and also named two of Riano's former patients. (See

Admin. R. at 52.)  By a letter dated March 2, 2011, Riano renewed his request to see medical records of certain former patients.  (Admin. R. at 52.)

27.     On March 8, 2011, a pre-hearing conference call was held.  (Admin. R. at 149.) Riano did not object to the VA offering the testimony of two former patients.  (Admin. R. at 150.)  Similarly, the DAB considered arguments as to Riano's proposed six former patient witnesses.  (Id.)  The DAB disapproved of all of Riano's former patients as witnesses, stating only "patient privacy" as its justification.  (Admin. R. at 151.)

28.     During the pre-hearing conference call, Riano argued that the medical records of former patients were relevant and subject to protective release to determine whether the patients suffered from any mental or other issues.  (Admin. R. 151.)  The VA objected to any such release.  (Id.)  The DAB took the issue under advisement.  (Id.)

29.     On March 9, 2011, the DAB emailed the parties about their respective witness lists.  All of Riano's former patients were disapproved, as was the former Navy Corpsman who trained with Riano.  (Admin. R. at 56-57.)  Dr. Barbara Wilson, who was listed as a witness by Riano, was disapproved as a witness because she could not provide "new testimony; [and had] no direct observation [of Riano] . . ."  (Admin. R. at 148.)

30.     Throughout Riano's appeal to the DAB, he was denied access to the names of the patients interviewed by Cossairt.  (Def.'s Answer to Am. Compl.)

### DISCIPLINARY APPEALS BOARD HEARING

31.     The matter proceeded to a hearing before the Disciplinary Appeals Board (DAB) on March 22, 2011.  (Admin. R. beginning at 528.)

32.     The first witness to testify was an expert for the VA, Dr. William Augenbaugh. (Admin. R. at 533.)  On direct examination by the VA, Augenbaugh acknowledged that no

11

protocols exist for treating or examining patients with genital warts. (Admin. R. at 534.) Augenbaugh testified that a firm surface on a patients' penis is "[g]enerally not" necessary. (Id.) In Augenbaugh's extensive experience, patients having erections was not unusual. (Admin. R. at 535.) Augenbaugh was not a military veteran. (Admin. R. at 537.)

33. The second witness to testify was Robert Beller, Medical Center Director for the Milwaukee VA. (Admin. R. at 541.) During Beller's testimony, the subject of prior terminations of nurses for similar conduct arose. (See Admin. R. at 546-547.) Riano requested that the VA produce these records to compare the purportedly similar conduct. (Admin. R. at 547.) The DAB denied Riano's motion, reasoning that such documentation would not be necessary to render a decision on the allegations against Riano. (Admin. R. at 547.)

34. The third witness to testify was Blaine Jansen, a Physicians Assistant at the Madison VA. Jansen had conducted "approximately 100" examinations for genital warts, and had never had a patient become erect, nor ejaculate. (Admin. R. at 549.) Jansen acknowledged that he sometimes used service-based language instead of civilian-based language with patients, and that if younger veterans used terms like "nuts," "balls," or "dick," he "would echo their language so that - - you know, kind of build a rapport that were on the same - -." (Admin. R. at 552.)

35. The fourth witness to testify was Judith Murphy, former associate director for nursing at the Milwaukee VA. (Admin. R. at 554.) On direct examination, Murphy opined at length about her personal feelings regarding what she believed Riano had done. (Admin. R. from 554-558.) Murphy was not aware that many parts of Cossairt's investigation were notes of Cossairt's recollection of his interviews with Riano's patients. (Admin. R. at 558.) Murphy never observed Riano in the Clinic, nor did she speak with any of his patients. (Id.) Murphy did

12

not recall whether the Clinic had any written protocols, nor was she familiar with procedures for removing genital warts.  (Admin. R. at 560.)

36.     After Murphy testified, Riano, through counsel, made his opening statement.  Riano raised a number of issues with the way Cossairt conducted his investigation, and the fact that the decision to terminate Riano was largely based on that investigation.  (Admin. R. at 561.)  Riano's former counsel lamented that: "We don't know what questions he asked during the interviews."  (Admin. R. at 561.)  She also expressed concern that Riano's sexual orientation had been extensively considered during the investigation.  (Id.)

37.     The first witness to testify for Riano was April Bigelow, PhD.  (Admin. R. at 562.)  Bigelow testified that approximately half of her patients become erect during examinations and that she continued examinations when an erection occurred.  (Admin. R. at 564.)  On cross-examination, Bigelow testified that it was not uncommon for "manipulation of the skin [to] cause[] an erection."  (Admin. R. at 565.)

38.     The second witness to testify for Riano was Jeanine Harvey, a health technician in the Milwaukee VA.  (Admin. R. at 569.)  Harvey testified that she had known a number of providers to apply pressure to the base of a penis to conduct a thorough examination of areas with redundant skin.  (Admin. R. at 570.)  She had seen frequent erections during male genital examinations, and testified that she had known patients to ejaculate during examinations.  (Admin. R. at 570.)  Harvey testified that she worked alongside Riano from the time the Clinic was established until his termination.  (Admin. R. at 571-572.)  Harvey also testified that Nivea cream was given to "[e]very single patient that came to the genital wart clinic . . ."  (Admin. R. at 572.)  Harvey said that her interactions with patients changed when they learned she had been a

13

corps(wo)man. (Admin. R. at 572-573.) She had been present for some of Riano's examinations of patients. (Admin. R. at 573.)

39.     Harvey also described an instance where a patient had a positive experience with Riano before being contacted by Cossairt. (Admin. R. at 574.) Harvey testified that this patient told her he had been told by Cossairt that "[w]hat [] Riano was doing is illegal," and now wanted to get a lawyer to file a lawsuit. (Admin. R. at 574.) Harvey said that she had been contacted by five patients about Cossairt's investigation:

> The five patients that spoke to me about the phone calls that they received seemed rather upset by the phone calls because that's how the conversation started. 'You know, what Jim Riano was doing was illegal. Do you feel you were ever inappropriately touched?' So there was a barrage of questions from these patients to me.

(Admin. R. at 577.)

40.     The next day, the Disciplinary Appeals Board hearing continued. Judith Murphy was recalled as a witness and a portion of her testimony was re-read into the record. (Admin. R. at 605-607.)

41.     After Murphy, Riano testified. (Admin. R. at 610.) Riano spoke at length about his credentials and explained how the Clinic was set up. (Admin. R. at 610-619.) Riano then explained his procedure in conducting an examination. (Admin. R. at 619-622.) Riano denied masturbating any patients, but admitted that he applied pressure to the base of a patients' penis to firm the area up for identifying and/or treating warts. (Admin. R. at 622.) Riano admitted using the terms "cock, dick, tool, [and] balls" with patients, but only if the patient identified their genitalia as such. (Admin. R. at 623.) Riano admitted that he gave his personal number to patients to accommodate their calendars for scheduling treatments. (Admin. R. at 625.) After direct examination, the hearing was recessed. (Admin. R. at 626.)

42.     After recess, Dr. Amber Robbins testified telephonically.  Robbins testified that she confirmed a number of Riano's diagnoses and described his examinations as "thorough." (Admin. R. at 626-627.)  Robbins acknowledged that applying pressure to the base of the penis is not "necessarily" within the standard of care.  (Admin. R. at 628.)

43.     Riano was then cross-examined.  (Admin. R. at 629.)  Riano testified that he was aware that five patients filed tort claims against the VA and that money was paid out to those individuals.  (Admin. R. at 635.)  Riano later answered questions from board members.  (Admin. R. at 637-643.)  In response to Riano's attorney's attempted introduction of an exhibit regarding the term "milking it," Chairperson Kerkhoff noted that "the board feels that there are ample sources available for examination techniques . . ."  (Admin. R. at 643.)

44.     In closing, the VA addressed Cossairt's investigation, stating that:

> the testimony of these veterans are simply too similar to be considered coincidental.  Some of the language between them is all the same.  There's no reason for any of these individuals to have made this up.  There is no reason for them to have concluded or conspired together to do something to Mr. Riano.

(Admin. R. at 644.)  The VA's attorney repeatedly quoted statements from Cossairt's memoranda of interviews as more credible than Riano's denials.  (See Admin. R. at 645.)

45.     After Riano's prior counsel provided a closing argument that questioned the veracity of Cossairt's memoranda of interviews, testimony was closed.  (Admin. R. at 646-647.)

### DISCIPLINARY APPEALS BOARD'S DECISION

46.     On July 1, 2011, the Disciplinary Appeals Board (DAB) rendered its decision. (Admin. R. at 2-36.)  The DAB noted that Riano consistently denied the allegations against him, but noted that "the statements made by the Veteran patients had a recurrent theme . . . sometimes . . . almost identical."  (Admin. R. at 3.)  The DAB then concluded it was "highly improbable

15

that these witnesses collaborated to make false statements." (Admin. R. at 3.) As to the "soundness" of the Inspector General's investigation done by Cossairt, the Board concluded "that there was **no evidence to substantiate [Riano's] claim**." (Admin. R. at 3.) (emphasis supplied.) Even though at least one veteran said Cossairt's memorandum falsified whether the veteran was shown Riano's statement during their interview, (statement of A1; Admin. R. at 200), the DAB accepted that all the patients interviewed "were asked whether they believed [] Riano's statements to be true or false." (Admin. R. at 3.) The Board similarly concluded that "there was no evidence of any bias on [the investigator's] part." (Admin. R. at 3.)

47.    The Board concluded that Riano was not credible because his written response to the allegation was inconsistent with his hearing testimony. (Admin. R. at 3.) The inconsistency? "[In his written response, Riano said] 'at no time did I ever tell a patient that they had to become erect in order for me to see better or to treat their lesions.' However, throughout his testimony, [] Riano described use of the engorgement technique to increase blood flow to the shaft of the penis . . ." (Admin. R. at 3.)

48.    The DAB then determined that Riano's manipulation of patients' penises was masturbatory. (Admin. R. at 4.) In so finding, the DAB relied almost exclusively on Cossairt's memoranda of interviews. (Admin. R. at 4.) The only non-memorandum of interview reference to masturbation cited by the DAB was H1's response to Cossairt's questionnaire. (Admin. R. at 4; see also Admin. R. at 304-313.) Each of the DAB's other references to masturbation come directly from Cossairt's recollection of his interviews with patients. (Admin. R. at 4.)

49.    After making these findings, the DAB began addressing the individual charges against Riano. Specifications one and two were substantiated. (Admin. R. at 5-7.) In its

discussion of specification number three, the DAB again addressed concerns raised about Cossairt's investigation:

> The Board noted that Mr. Coissart was not called as a witness, but [Riano's] attorney impuned (sic) the integrity of the OIG investigator's inquiry. On multiple occasions, [Riano's] attorney characterized the investigative report at (sic) double hearsay, biased and misleading. The Board does not find **any evidence** to substantiate [Riano's] attorney's opinion that the OIG questionnaire is biased, misleading or double hearsay.
>
> In response to [Riano's] attorney contesting of the OIG questionnaire, the Board notes that the questionnaire has no open ended questions, it does not contain [Riano's] name and the document states they are investigating allegations of inappropriate conduct by a member of the clinic's staff.

(Admin. R. at 7.) (emphasis supplied.)

50.     Specification number four was substantiated based on Cossairt's memorandum of his interview with T1. (Admin. R. at 8.) Number five was sustained, in part, based on Cossairt's memorandum of his interview with D1. (Admin. R. at 8-9.) The DAB found Riano to not be credible because one patient made a statement that Riano told him he had nice skin, a statement Riano denied making. (Admin. R. at 9-10; see Admin. R. at 624—Tr. Page 283, lines 17-21.) Specification number six was substantiated based on Cossairt's memorandum of his interview with C1. (Admin. R. at 10-11.) In so doing, the DAB explicitly found Cossairt's recollection of the patient's comments to Cossairt to be more credible than Riano. (Admin. R. at 11.)

51.     Specification number seven was sustained, even though the patient wrote that he did not feel violated by Riano and thought Riano was acting in his best interest. (Admin. R. at 11.) Specification number eight was sustained, and the DAB again found the patient's responses more credible than Riano's consistent denials, based on the patient's statement's similarity to other patients' responses. (Admin. R. at 12.)

17

52.     Patient F2 was the basis for specification number nine.  F2 wrote that Riano would stretch and manipulate his penis to create blood flow.  (Admin. R. at 13.)  However, in Cossairt's memorandum of his interview with F2, "masturbatory way" was quoted.  (Id.)  The DAB explicitly found Cossairt's report more credible than the patient's own statement, but at least noted the discrepancy.  (Admin. R. at 13.)  Specification 10 was substantiated based on the patient's written response to Cossairt's questionnaire and Cossairt's memorandum of his interview with patient D2.  (Admin. R. at 13-14.)

53.     Specification 11 was based on patient C2.  (Admin. R. at 14-15.)  C2 wrote that his genitals were manipulated, but "not in a way [he] felt was inappropriate."  (Admin. R. at 15.)  Although C2 agreed that Riano never told him he needed to become erect, agreed that Riano never told him that other patients had to become erect to see warts, and "d[id] not feel anyway threatened or molested," the DAB substantiated specification 11.   (Admin. R. at 15.)  Specification 12 was substantiated based on the patient's response to Cossairt's questionnaire, Cossairt's memorandum of his interview with C3, and the similarity of C3's responses to other patients.  (Admin. R. at 15-16.)

54.     Specifications 13 and 14 were also substantiated.  (Admin. R. at 16-18.)  In substantiating specification 14, the DAB found that because two patients allegedly said similar things, which were recorded in Cossairt's memoranda of those interviews, their statements were more credible than Riano's denial.  (Admin. R. at 18.)

55.     Specification 15 involved patient M2, who had expressed concern about Cossairt's methods, including stating that Cossairt misrepresented his answers and that Cossairt told him that what Riano had done was illegal.  (Admin. R. at 202-203.)  However, the DAB did not appear to consider M2's statements that Cossairt misrepresented his answers, nor M2's

statement that "Riano never did anything unprofessional or inappropriate" in sustaining specification 15 against Riano. (See Admin. R. at 19.) Specification 16 was substantiated based upon Cossairt's memorandum of his interview with T2. (Admin. R. at 19-20.)

56.     Specification 18 involved patient A, who, like M2, raised serious concerns about Cossairt's investigation. A said that he never told Cossairt that Riano "massaged" his penis, nor did he tell Cossairt that Riano's conduct involved "motions similar to masturbation, but not exactly." (Admin. R. at 200.) Even though A denied saying the things Riano was charged with in specification 18, the DAB either ignored A's statement or did not account for it, and substantiated specification 18. (Admin. R. at 21-22.)(see also n. 2, *supra*.)

57.     Like specification 18, specification 19 involved a patient who complained about Cossairt's methods, but whose complaints were apparently ignored by the DAB. (Stmnt. Of S1; Admin. R. at 195-196.) ("[Cossairt] appears to have intentionally included only neutral or negative feedback in his report, which grossly misrepresents how patients feel . . .") Nevertheless, the DAB relied upon Cossairt's memorandum of his interview with S1 to substantiate specification 19. (Admin. R. at 22-23.)

58.     Charge II against Riano alleged various unprofessional comments to veterans. (Admin. R. at 23.) Curiously, specification one of charge II was unsustained. Specification one alleged that Riano told a patient that Riano would collect the patient's sperm and perform a sperm count. The DAB concluded that this was not an "unprofessional comment." (Admin. R. at 23.) Specifications two through 15 were sustained, with the DAB repeatedly concluding that patients' responses or Cossairt's memoranda of interviews were more credible than Riano's consistent denials. (Admin. R. at 23-32.) There is one discussion section Riano wishes to point out:

> The Board does not deem [Riano's] denial of this question to be credible. Mr. Riano made the statement regarding nice skin or smooth skin to a different. Why would another Veteran fabricate this statement and how would another Veteran have this information. How would another Veteran . The statement [Riano] is alleged to have made to a patient about another patient is too similar to what Mr. Riano testified to and what he wrote in his written response to the proposed discharge.

(Admin. R. at 27-28) (fragments and errors in original).

59.     The DAB essentially adopted the VA's reasoning as to why Riano's termination was appropriate.  (Admin. R. at 32-35.)  On August 22, 2011, the Principal Deputy Under Secretary of Health executed the DAB's decision to discharge Riano, and this appeal follows.

## ARGUMENT

60.     It goes without saying that the work Riano was performing in his duties at the Clinic was highly sensitive in nature.  Riano was a male nurse tasked with performing treatments that required him to thoroughly examine male veterans' genital areas.  At least four[5] individuals identified within the Administrative Record—two doctors, a registered nurse, and a patient—recognized that the sensitive and awkward nature of these examinations, coupled with the circumstances of Riano's employment, could skew a patient's perceptions.

61.     Riano asserts that the investigation into his alleged wrongdoing was fatally flawed and that these flaws permeated the entire termination process.  Furthermore, because Riano was denied the opportunity to cross-examine witnesses and to present a meaningful defense, he was denied the tools he needed to adequately expose these flaws.  Therefore, the decision of the Department of Veterans Affairs to discharge Riano from federal employment is unlawful and must be set aside.  As further argument, Riano states the following:

---

[5] (Doctors Barbara Wilson, David Eilers; Registered Nurse Michael Williams; and patient F2.) (Admin. R. at 291, 430, 270, and 363.)

20

I.    **The Flawed Investigation Into Claims of Riano's Alleged Misconduct Failed To Follow Required Procedures And Tainted Every Step Of The VA's Process, Including The Ultimate Decision to Discharge Riano.**

62.    The Inspector General's investigation into Riano began after a complaint filed to initiate a lawsuit, developed with a strongly suggestive questionnaire, and was completed by an investigator whose methods and tactics had been called into question.  Those who called the investigation into question were not permitted to testify or were ignored, while those who cast blame upon Riano were given an anonymous common voice by Cossairt—the investigator. Once Cossairt provided the anonymous common voice, it was echoed time and time again: first by Doctor Eilers, then by Human Resources in its review of the *Douglas* factors, then by the Medical Center Director in proposing Riano's discharge, then by the Disciplinary Appeals Board in upholding Riano's discharge, and, finally, by the Deputy Under Secretary of Health in executing Riano's discharge.

63.    The decision to discharge Riano was based almost exclusively on the investigation conducted by Investigator Cossairt.  The VA first proposed Riano's discharge on June 9, 2008, based upon the allegation of M1.  (Admin. R. at 435.)  That proposed discharge was rescinded on July 9, 2008 "pending completion of [Cossairt's] investigation." (Admin. R. at 435.)  Cossairt had completed his interviews with Riano's patients by April 2, 2009.  (Admin. R. at 427.)  On that date, Cossairt incorporated his memoranda of interviews to seek Dr. Eilers' opinion on Riano's conduct.  (Id.)  Cossairt incorporated Dr. Eilers' opinions into his investigative report, which was filed June 2, 2009.  (Admin. R. at 222.)  On December 9, 2009, the VA proposed Riano's discharge, citing numerous allegations of wrongdoing based upon statements made to Cossairt.  (Admin. R. at 477-487.)  On January 25, 2010, Riano orally responded to the proposed discharge, as memorialized in Judith Murphy's memorandum of

same. (Admin. R. at 489.) Murphy questioned Riano based on Cossairt's memoranda of interviews with Riano's patients. (See Admin. R. at 491.) ("Murphy stated that several veterans reported being extremely uncomfortable with [] Riano's manipulation.") By a memorandum dated February 5, 2010, the VA's Human Resources conducted its review of the *Douglas* factors, based on the investigation presented by Cossairt. (Admin. R. at 494.) Based on its review of Cossairt's report, the VA concluded that Riano's actions were "clearly intentional" and that he "most likely derived" "personal gratification" from his actions. (Admin. R. at 495.) On February 8, 2010, Judith Murphy recommended that Riano's proposed discharge be sustained, stating that the "evidence collected by the Office of the Inspector General was overwhelmingly consistent . . ." (Admin. R. at 501-502.) Lastly, as demonstrated above in paragraphs 46 through 58, the Disciplinary Appeals Board relied extensively on Cossairt's memoranda of interviews, upon which it based countless credibility findings.

64. Cossairt failed to obtain sworn statements from Riano's patients. The VA Handbook reads that, during an investigation: "The resulting information will be documented. Signed statements, preferably under oath, are the best form of documentation, and should be obtained, whenever possible, from employees interviewed." *Part II, Chapter 1, Section 6 (a)(1)(c)*; (Admin. R. at 260.) Cossairt did not obtain statements signed under oath from Riano's patients; instead, Cossairt wrote a written summary of his recollection of the interviews with Riano's patients. These written summaries were not reviewed by the patient for their accuracy.

65. Cossairt also failed to investigate Riano impartially. The same VA Handbook provides that: "Evidence will be obtained impartially and an effort will be made to resolve any conflicting statements by developing additional evidence." *Part II, Chapter 1, Section 6 (a)(1)(d)*; (Admin. R. at 260.) As above, numerous patients complained that Cossairt initiated

22

interviews by telling patients that Riano acted illegally, asked leading questions, often asked and re-asked questions to get his preferred answer, and paid for at least one patient's meal. Cossiart also asked each patient whether they thought Riano was a homosexual.

66.     The examinations Riano conducted certainly presented an opportunity for patients to misconstrue an already awkward procedure. It is not unreasonable to think that a veteran— someone who, by law, was not permitted to work alongside openly homosexual individuals— upon hearing that their provider was a homosexual who had acted "illegally" and whose actions might bring financial compensation might shape his responses to a coercive investigator to fit a narrative of wrongdoing. We already know that some patients complained about Cossairt conducting his investigation in such a manner, but Riano was never permitted to further inquire whether Cossairt conducted all his interviews in such a manner.

67.     Cossairt also failed to talk to Riano or Jeanine Harvey, who testified during Riano's hearing that she had been present for a number of Riano's examinations and had known many of Riano's patients. (See Admin. R. at 570-573.) The VA Handbook says that: "Investigating officials will seek information concerning the matter from the employee(s) who is alleged to have committed the offense and from any other persons who may have pertinent information about the incident(s)." *Part II, Chapter 1, Section 6 (a)(1)(b)*; (Admin. R. at 260.) After speaking with Riano or Harvey, Cossairt could have, for example, asked the patients why they denied a standby—a person to stay in the room during examinations. (See Admin. R. at 190.) Perhaps he did, but again, we simply do not know.

68.     As amply demonstrated, Cossairt's investigation was fatally flawed and the VA's decision to terminate Riano was based almost exclusively on the results of that investigation. On top of a flawed investigation, the Disciplinary Appeals Board's decisions to deny Riano access to

23

the medical records and the names of the complaining patients, and its decision to deny Riano the opportunity to cross-examine the complaining patients, deprived Riano of the very tools required by law and regulations to present a meaningful defense.

**II.  Riano Was Denied the Opportunity to Present A Defense And To Cross-Examine Witnesses In a Case That Was Predominantly Decided On a Credibility Basis.**

69.     The Disciplinary Appeals Board's decision to terminate Riano was an abuse of discretion, and obtained without procedures required by laws and regulations.  First, the VA violated its own rules.  The VA Handbook, Part V, Chapter 1 contains the Rules regarding Disciplinary Appeals Board hearings.  Subsection (f) describes rules about witnesses, stating: "Both the appellant and management will have the right to call witnesses . . ."  Subsection (g) informs subsection (f) and provides rules about questioning witnesses:

> The Chairperson will permit the parties to the case to ask questions of witnesses in order to ascertain all pertinent facts and is authorized to exclude irrelevant and/or unduly repetitious evidence.  Both sides will have an opportunity to properly present and support their respective positions upon any question or matter presented to the Board for decision.

Subsection (h) describes rules about patients testifying:

> A patient, with the patient's consent, may be a witness provided there has been a medical determination that the patient has the capacity to testify and that the patient's appearance as a witness will not be detrimental to the patient's health and welfare.

70.     The DAB denied Riano's request to have a number of his former patients testify by merely citing "patient privacy."  (Admin. R. at 151.)  These patients were available and evidently consented to testifying.  The DAB never made or asked for a determination as to whether these patients had the capacity to testify.  Similarly, if these patients were themselves willing to testify, then how could their testimony be "detrimental to the[ir] health and welfare"?

24

71.     Second, in addition to these rules and regulations, the DAB violated its own rules by not allowing a number of Riano's proposed witnesses to testify.  In a pre-hearing letter, the DAB wrote: "In determining the approval of witnesses the Board will review the nature of the testimony of each witness.  Consideration will include the factors of relevancy, materialness, and repetitiousness."  (Admin. R. at 135.)

72.     None of these factors appear to have been considered in determining whether these patients could testify.  Their testimony would have been relevant, as it could have provided a basis upon which the veracity of all of Cossairt's memoranda of interviews were called into question.  Their testimony would have been material, as it went to the heart of Riano's defense— that he performed thorough examinations, which were subject to being misconstrued.  Lastly, their testimony would not have been repetitious; each former patient could have testified to unique experiences with not only Riano, but also with Cossairt.

73.     Third, the DAB also violated Riano's constitutional rights to present a meaningful defense and to confront and cross-examine witnesses.  "Cross-examination is the principal means by which believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 415 U.S. 308, 316 (1974).  "While not necessary in every case, 'procedural due process often requires confrontation and cross-examination of those whose word deprives a person of his livelihood.'"  *Walker v. United States*, 744 F.2d 67, 70 (10th Cir. 1984) (footnote and citations omitted); *see, e.g., Adams v. Sewell*, 946 F.2d 757, 765 (11th Cir. 1991) ("This court has emphasized the importance of cross-examination in due process analysis; post-termination proceedings have been held inadequate because a terminated employee 'had no opportunity to confront and cross-examine his accuser in the presence of the decision maker.'") (quoting *Kelly v. Smith*, 764 F.2d 1412, 1415 (11th Cir. 1985).

74.     In *McNeill v. Butz*, McNeill was terminated for using his position within a governmental agency to obtain the benefits of a tobacco lease without notifying the owner of the property, and for improperly receiving payments. 480 F.2d 314, 317 (4th Cir. 1973). McNeill denied the allegations against him and appealed his suspension. 480 F.2d at 317. The matter proceeded to hearing where:

> four days before the appeal hearing, the government for the first time furnished McNeill's counsel with selected excerpts of the audit and investigatory reports. These excerpts contained only government-prepared recapitulations of incriminating evidence, but included no affidavits or sworn statements or the identity of McNeill's accusers. At the same time, the government advised McNeill's counsel that he could not examine the government's witnesses. At the hearing, McNeill's renewed requests to examine the government's witnesses and the complete investigative files were denied.

*McNeill v. Butz*, 480 F.2d at 317. After his suspension was upheld, McNeill brought suit. *Id*. at 318. The court of appeals noted that the allegations against McNeill were "relatively serious accusations that . . . impugn [McNeill's] good name, reputation, honor and integrity." 480 F.2d at 320. The court also surmised that McNeill was likely foreclosed from other governmental employment and that his "private employment prospects will also be prejudiced." *Id.* at 320.

75.     The *McNeill* court analyzed the matter through the lens of procedural due process. 480 F.2d at 321. The court first noted that McNeill did not have the "opportunity to learn the identity of, to confront, and to cross-examine his accusers." *Id*. The court noted that the U.S. Supreme Court has stressed the vital nature of confrontation and cross-examination in various civil settings, quoting *Greene v. McElroy*, 360 U.S. 474, 496-497 (1959):

> Certain principles have remained relatively immutable in our jurisprudence. One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue. While this is important

26

in the case of documentary evidence, it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy. We have formalized these protections in the requirements of confrontation and cross-examination . . . This Court has been zealous to protect these rights from erosion. It has spoken out . . . in all types of cases where administrative . . . actions were under scrutiny.

*McNeill*, 480 F.2d at 322. Considering *Greene* and other cases, the *McNeill* court concluded that McNeill should have been provided a hearing where he could "confront and cross-examine the government's informers." 480 F.2d at 322. The court then stated that McNeill's interest in challenging damning evidence and preserving his job and reputation outweighed the government's interest in efficiently terminating substandard employees. *Id*. at 322-323. The court held that where employees are discharged "on the basis of secret charges which impugn their honesty and integrity, and where they have made timely and good faith requests to confront their nameless accusers, procedural due process requires . . . an opportunity to refute the charges by confronting and cross-examining such adverse witnesses . . ." *McNeill*, 480 F.2d at 325.

76. There can be little dispute that the charges against Riano were largely secret—he was denied the names and medical records of complaining patients, whose "statements" were unsworn, written by an investigator, and never assessed for their reliability. Riano had to guess at the identity of a number of the complainants. (Admin. R. at 190-194.) Further, the allegations have and will continue to impugn the integrity of Riano—he is no longer gainfully employed in the field of his choosing, he is now listed on the National Practitioner Data Bank, and his private employment prospects will surely be limited in the future. Like the government in *McNeill*, Riano was provided "selected excerpts from its investigative . . . reports, at best anonymous double hearsay." 480 F.2d at 325. As in *McNeill*, Riano's right to confrontation was denied.

77.     The problem with not allowing any patients to testify is severely compounded by the concerns raised by a number of the patients about Cossairt's investigation. Much of the DAB's decision rests on credibility issues—the DAB found Riano incredible, yet gave full weight to Cossairt's memoranda of interviews. A number of these memoranda contain misrepresentations and/or out-of-context statements, and numerous patients complained about Cossairt asking leading questions and re-asking questions to get a preferred answer. Not only were patients not permitted to testify, but Cossairt himself never testified. Nevertheless, the DAB based its credibility determinations on unsworn memoranda taken by an investigator whose impartiality had been called into question and who did not testify himself.

### III. The Evidence Adduced Against Riano Consisted of Anonymous Double Hearsay; Therefore, the VA's Decision to Terminate Riano Is Unsupported by Substantial Evidence.

78.     No one who directly observed Riano's practices testified at Riano's hearing. Nor did any of Riano's patients testify, and Riano was denied access to the names and medical records of those patients he was unable to identify through Cossairt's investigation. The evidence adduced against Riano at his hearing consisted of statements purportedly made by Riano's former patients to Investigator Cossairt, who then wrote a memoranda of each interview based on his recollection of the interview. Cossairt himself never testified.

79.     The statements of Riano's patients as purportedly memorialized in Cossairt's memoranda are hearsay; they are statements by a declarant made while not testifying, and they were offered by the VA to prove the truth of the matter asserted. *See* FRE 801. Riano asserts that no exception to the general rule excluding hearsay exists to these statements, and, in any event, the burden is on the proponent. Furthermore, because Riano's patients' statements were actually written by another declarant—Cossairt—they consist of hearsay within hearsay, for

Case 2:11-cv-00939-CNC   Filed 09/13/12   Page 28 of 29   Document 19

which, again, no exception applies.  The only reliability finding made by the DAB was that the statements written by Cossairt and purportedly made by each patient were "similar."  (Admin. R. at 28.)

80.     Evidence is not substantial unless there is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938.)  Because the VA's decision to terminate Riano was largely based upon anonymous double hearsay—Cossairt's redacted written summaries of his interviews with various patients, much of which was called into question by Cossairt's tactics—it was made without substantial evidence and must be set aside.

## CONCLUSION

For all the reasons stated, Riano respectfully requests that the VA's decision to terminate him rather than reinstate him, award him back pay, and make him whole, be held unlawful and set aside.

Dated at Milwaukee, Wisconsin, this 13th day of September, 2012.

KOHLER & HART, S.C.
Attorneys for James Riano, Plaintiff

 _/s/ Geoffrey R. Misfeldt_____
Martin E. Kohler
Wisconsin Bar No. 1016725
mekohler@kohlerandhart.com
Geoffrey R. Misfeldt
Wisconsin Bar No. 1065770
grmisfeldt@kohlerandhart.com

**P. O. ADDRESS:**
First National Bank Building
735 North Water Street, Suite 1212
Milwaukee, WI 53202
Phone:  (414) 271-9595
Fax:  (414) 271-3701

29