UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

JAMES E. RIANO, R.N.,

                Plaintiff,

           v.                            Case No. 11-C-0939

ERIC SHINSEKI,
*Secretary of Veterans Affairs*,

                Defendant.

---

DECISION AND ORDER AFFIRMING AGENCY DECISION

Plaintiff, James E. Riano, has sought judicial review of the termination of his employment by the Department of Veterans Affairs (VA). At the time of his termination, Riano was a registered nurse at the Clement J. Zablocki VA Medical Center in Milwaukee, Wisconsin (VAMC). Based on the parties' arguments and the court's review of the administrative record, the termination is affirmed.

FACTS

In August 2004, James Riano began employment as a registered nurse at the VAMC. (Doc. 12 at 4.) In a Nurse II position proficiency report he exceeded standards for qualifications, functionality, competency, and quality of care, and was promoted to the Nurse III position. (R. 79, 82-85.[1])

In 2007, the VAMC created a special dermatology clinic to meet the need among veterans for genital-wart treatment. Riano was chosen to start the clinic, as he had worked with genital warts as a corpsman in the U.S. Navy. (*See* R. 223.)

---

[1]"R." denotes the administrative record in this case, filed as an attachment to Document 14 following a few index pages. The page reference is to the Bates-stamped page number of the record, not the page number in the court's CM/ECF system.

After the clinic opened, one of the veteran patients, M1, reported to the Milwaukee Police Department that Riano sexually assaulted him during examinations by manually manipulating his penis to erection and, on occasion, to ejaculation. (R. 224, 494, 541.) M1 reported that Riano said it was easier to see genital lesions on M1's penis when it was erect. (R. 224.) No criminal charges were filed. (R. 494.) However, VAMC Director Robert Beller removed Riano from direct patient contact and ordered an investigation. (R. 540-41.)

The investigation was conducted by the VA's Office of Inspector General (OIG). OIG assigned the investigation to Special Agent Joseph Cossairt. (*See* R. 222.) Cossairt mailed questionnaires to the forty-eight veteran patients who had been seen by Riano for genital skin conditions, and conducted twenty-two follow-up interviews with those who returned the questionnaires. (R. 222, 297.) Cossairt then wrote a report of his investigation. (R. 226-36.) Details of the questionnaires and Cossairt's report are discussed below, but generally, nineteen veteran patients described Riano's technique of touching their penises to stimulate blood flow to engorge the penis or stretch the skin, and Riano's explanation that the engorged or semi-erect state was necessary for his examination for genital warts. (R. 222, 226.) Sometimes, Riano applied Nivea cream to the patients' penises. (*See* R. 231-32.) Additionally, the questionnaires and Cossairt's report reflected language the veteran patients said Riano used during their visits, Riano's comments regarding their genital skin and grooming, and Riano's discussion of other veteran patients' conditions or treatments. (*See, e.g.*, R. 233-34.)

Cossairt provided his report to Dr. David Eilers, the Chief of Dermatology at Hines VA Hospital in Illinois. Eilers also reviewed a response by Riano's attorney. (R. 430.) Cossairt asked Eilers to review Cossairt's memorandum and comment on the patients' care.

2

(R. 427-28.) Eilers responded, saying that he did not think Nivea cream needed to be applied to the penis for examination and that he had not seen very many patients with dry penile skin. (R. 430.) Further, Eilers stated that he was

> not familiar with the technique or need to apply pressure at the base of the penis to provide a firmer surface. That very well may be a described technique. I however am not aware of it. I do think someone could probably rationalize that a firmer surface could be more readily examined. My guess is that it probably is a described albeit uncommonly applied technique, and I don't think it is necessary in doing the skin exam. It certainly is not part of the standard of practice, though it may have been part of nurse Riano's training.

(R. at 430-31.) Eilers concluded that it was not medically necessary for a patient to have an erection to treat genital warts, but they could be more easily identified in that state; he was not aware of it ever being medically appropriate to manipulate the penis to increase blood flow; that Riano's actions were outside the standards of care known to Eilers; and that Riano made inappropriate comments through use of crude language and the sharing of other patients' experiences. (R. 432-33.)

After consideration of Cossairt's investigation and Dr. Eilers's conclusions, the VA sent Riano a proposed discharge letter on December 9, 2009, alleging nineteen specifications of inappropriate manipulation of patients' genitals and fifteen specifications of unprofessional comments during examinations or treatment. Riano provided an oral response (R. 182-85) and a written response (R. 187-89; *see also* R. 264-68). Riano claimed he had been taught while a medical personnel corpsman to be thorough and to apply pressure to the base of a penis during a penile exam to retain blood within it. (R. 182-84.) Riano said he was consistent with all of his patients. (R. 184.)

VAMC Director Beller reviewed the proposed discharge, Riano's responses, certain required factors, a memorandum from Judith Murphy (Associate Director of Patient/Nursing

3

Services) recommending Riano's removal (R. 501-02), and the OIG report. (R. 543-46.) Director Beller sustained Riano's discharge, effective February 19, 2010. (R. 158-60, 546.)

Riano timely requested a formal Disability Appeals Board (DAB) hearing to review the discharge decision. (*See* R. 37.) Riano sought discovery, including the medical records and the names of the veteran patients identified in the specifications. (R. 43-48.) The DAB denied the request for names and medical records, citing lack of relevancy. (R. 144-45.)

Also, Riano sought approval for various witnesses at the hearing, including six former veteran patients who would testify regarding their experience with Riano at the clinic. (*See* R. 50-51.) The VA's witness list included two of Riano's former veteran patients. Prior to the hearing the DAB disapproved all veteran patient witnesses for both the VA and Riano, citing the patients' privacy, concern for emotional harm, and the adequacy of information in veterans' written statements. (R. 34, 56-57, 146, 151.)

The DAB held a hearing on March 22 and 23, 2011, at the VAMC. (*See* R. 2, 528-29, 605-06.) Dermatologist William Aughenbaugh, an associate professor at the University of Wisconsin Medical School, testified for the VA, stating that he had treated thousands of male patients for genital warts and that it was not necessary to have a firm surface on or enlarging of the penis to examine or treat them, although the doctor sometimes gently stretched the skin. (R. 533-34.) He acknowledged that it was not unusual for a patient to develop an erection during an examination for genital warts. (R. 534-35.) Dr. Aughenbaugh indicated that engorgement and application of cream were not medically necessary to identify and treat genital warts. In his experience, patients having erections was not usual, but if a patient indicated he was going to ejaculate, the doctor would stop what he was doing and leave the room. (R. 535-36.)

4

Blaine Jensen, a certified physician's assistant working in dermatology at the Madison VA facility, testified for the VA. Jensen testified that he had treated about 100 male patients for genital warts, most examinations lasted less than five minutes, and he had never had a patient develop an erection or ejaculate during an examination. (R. 549.) Jensen said he touched and moved a patient's penis or scrotum if necessary to see underneath it. (R. 549, 551.) However, he believed it was not necessary to increase blood flow to the penis during an examination and that an erection would not make treatment easier. (R. 549-50.) He had never applied pressure to increase blood flow to a patient's penis. (*Id.*) In his medical opinion, an erection would not make treatment easier. (R. 550.) Jensen acknowledged that he sometimes used service-based language with patients, echoing the language that the veteran used to build rapport. (R. 552.)

Judith Murphy, former associate director for nursing at the VAMC, testified for the VA. She had never observed Riano at the clinic nor spoken with any of his patients. She could not recall whether the clinic had any written protocols for removing genital warts. (R. 559-60.) Murphy took Riano's oral response to the charges and was a member of the management team that proposed his discharge. (R. 554-55.) As director of nursing services, Murphy found it inappropriate and unprofessional to use language such as "pecker" and "dick" rather than anatomical terms. (R. 555-56.)

Dr. April Bigelow, clinical assistant professor at the University of Michigan School of Nursing and a nurse practitioner in a sexually transmitted disease clinic, testified on Riano's behalf. (R. 562.) Bigelow had treated hundreds of patients for genital warts. (R. 568.) She testified that during genital wart examinations she touched her patients (wearing gloves). She said it was not uncommon for manipulation of the skin to cause an erection. (R. 565.)

About half of her patients became erect during examinations and that in response she acted as if it was a normal reaction. (R. 564.) She opined that Riano acted within the scope of practice as a registered nurse. (R. 565.) She said it was not necessary to apply pressure at the base of the penis to retain blood within the shaft for an examination, and she had never had a patient tell her he was about to ejaculate. (R. 566.) Bigelow was not aware of any medical procedure by which increased blood flow to or deliberate stimulation of the penis was necessary. (R. 566-67.) She said there is no specific procedure for examining a man's genitals. (R. 565.) Bigelow stated that although she does not condone the use of "street language" or crude language with patients, she sometimes uses such language if patients do not understand anatomical terms first and use of the slang improves communication. (R. 567.)

Riano's second witness was Jeanine Harvey, a health technician at the VAMC, who worked alongside Riano from the time the clinic opened until Riano was terminated. She had been present for some of Riano's examinations of veteran patients. (R. 573.) She said she had known a number of providers to apply pressure to the base of a penis to conduct a thorough examination of areas with redundant skin, mostly in the military. (R. 570.) According to Harvey,

> I can say that many people do it many different ways, you know. But for the most part a thorough male genitalia examination—there's no other way to do an examination other than provide firm pressure at the base of the penis, and there's a lot of redundant skin in that area. They would pull or manipulate the area quite frequently to look at all the skin . . . . There's a lot of stretching and pulling involved and not just the penis, the testicles also.

(R. 570.) She had seen frequent erections during male genital examinations and had known patients to ejaculate during some examinations. (R. 570.)

6

Next, Riano testified.  (*See* R. 611.)  He explained his procedure in conducting examinations.  He stated, among other things, that his examining practice involved engorging the penis with blood by holding the base of the shaft, to stretch the skin and entrap blood to provide a firmer surface so genital warts could better be detected.  (*See* R. 619-22, 629.)  He admitted that he applied pressure to the base of a patient's penis to firm the area up for identifying and treating warts:  "I would apply pressure at the base.  I would be pulling out on the penis, depending on the anatomy of the patient and how difficult their anatomy was in order to be able to see what I needed to see."  (R. 622.)  He testified that out of 100 patient visits about eight patients would have a full erection and seventy-five to eighty would have semi-erect penises during examination.  (R. 629-30.)  He used the word "engorgement" instead of "erection" because it was not used in a sexual context.  (*See* R. 629-30.)  Riano said he was trained while a corpsman in the late '70s and early '80s to engorge the penis for a genial lesion examination.  (R. 630.)  He admitted that he never discussed or obtained approval for this engorgement technique from any physician, nurse, or peer review group.  (R. 629-30.)  Riano said he applied Nivea (using one finger) to create a sheen to the shaft, but he admitted that the cream was not necessary to see genital warts.  (R. 631.)  He was not able to produce any documentation supporting the use of Nivea for that purpose.  (R. 631.)  Riano said he treated all of his  patients the same.  (R. 620.)  He denied ever wrapping his hand around a penis and stroking it.  (R. 622.)

Riano admitted that M1 (the veteran who filed a report with police) ejaculated during two separate examinations and during one of those examinations M1 had warned him: "'Jim, if you pull on that one more time, you're going to get something that you're not expecting.'"  (R. 633.)  Despite the warning, Riano had continued to manipulate M1's

scrotum, resulting in ejaculation.  (R. 633.)  Riano admitted he had been pulling out and examining M1's penis.  (R. 633.)

Riano denied ever telling a veteran patient that he had another patient who had become aroused had said "if you kept doing that, you wouldn't like what happened." (R. 623-24.)  He denied ever telling one patient about another patient who said "'you better stop, or you're going to get something you're not expecting.'" (R. 624.)  He denied ever telling a patient about another patient who had ejaculated during an examination.  (R. 624.)

Riano admitted to using the terms "cock, dick, tool, [and] balls" with veteran patients, but only if the patient first identified his genitals that way.  Riano said he did not initiate use of those terms.  (R. 623.)

Next, dermatologist Amber Robbins testified on Riano's behalf.  Robbins had worked at the VAMC dermatology clinic in the fall of 2007 as resident chief.  (R. 626.)  She testified that she observed Riano in the genital lesion clinic and described his examinations as "thorough." (R. 626-27.)  She said Riano seemed to be a very capable nurse—one of the best she had worked with.  (R. 627-28.)  She did not recall any written policies or procedures for the genital warts clinic.  (R. 626.)  However, she stated that engorging the penis to check for genital warts was not a method she would use.  (R. 627.)  She said that applying pressure at the base of the shaft was not "necessarily a standard of care, no," and she did not know of any procedure by which a patient would need to be erect for a genital wart examination.  (R. 628.)  She had conducted at least twenty or thirty genital warts examinations in private practice after her VA work and had no patients ejaculate and rarely had a patient develop an erection.  (R. 628.)

During the hearing, Riano's attorney raised a number of issues with the way Cossairt conducted his investigation, pointing out that no one at the hearing knew what questions he asked during the interviews. (*See* R. 561-62, 646-47.) She expressed concern that Riano's sexual orientation had been considered during the investigation. (R. 561.)

The disciplinary action against Riano was based on two charges: inappropriate manual manipulation of male veterans' genitals (Charge I) and unprofessional comments to veterans during examination or treatment (Charge II). Charge I was supported by nineteen "specifications" or instances of such alleged conduct. Charge II was supported by fifteen specifications.

In a thirty-five page Board Action issued on July 1, 2011, the DAB sustained all nineteen specifications of Charge I, proving Charge I in its entirety, and fourteen specifications of Charge II, proving Charge II in its entirety.[2] (R. 2-36.) More details of the written decision are discussed below. The Principal Deputy Under Secretary of Health executed the decision. (R. 1.) This appeal followed.

ANALYSIS

Registered nurses and certain other VA employees have the right to appeal unfavorable personnel actions. 38 U.S.C. §§ 7401(1), 7461(a). In the event of a major adverse action regarding a question of professional conduct or competence, the employee first appeals to the DAB. 38 U.S.C. §§ 7461(b)(1), 7462. Major adverse actions include

---

[2]Under the "specification rule," only so much of a specification as necessary to sustain the essence of the charge need be proved, and just one proven specification is sufficient to sustain a charge. *See Burroughs v. Dep't of the Army*, 918 F.2d 170, 172 (Fed. Cir. 1990); *Avant v. Dep't of Air Force*, 71 M.S.P.R. 192, 198 (1996).

dismissals, questions of professional conduct or competence including direct patient care and clinical competence. 38 U.S.C. § 7461(c)(2).

A VA employee whose termination is affirmed by the DAB may appeal to the district court. 38 U.S.C. § 7462(f)(1). The case proceeds as an administrative appeal. *See Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1580 (10th Cir. 1994). The standard of review is similar to that for judicial review of other administrative actions. *Abaqueta v. United States*, 255 F. Supp. 2d 1020, 1024 (D. Ariz. 2003). The district court reviews the administrative record and may set aside the agency's finding, conclusion or action if it was

(A)     arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
(B)     obtained without procedures required by law, rule, or regulation having been followed; or
(C)     unsupported by substantial evidence.

38 U.S.C. § 7462(f)(2).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Fed. Maritime Comm'n*, 383 U.S. 607, 620 (1966); *Minnick v. Colvin*, 775 F.3d 929, 935 (7th Cir. 2015); *Roundy's Inc. v. NLRB*, 674 F.3d 638, 646 (7th Cir. 2012); *Lerner v. Shinseki*, No. 3:12-CV-00565, 2013 WL 5592906, *7 (W.D. Ky. Oct. 10, 2013); *Abaqueta v. United States*, 255 F. Supp. 2d 1020, 1024 (D. Ariz. 2003). "Substantial evidence" is more than a scintilla, but less than a preponderance. *Lerner*, 2013 WL 5592906 at *6 . The standard has been likened to the amount of evidence needed to avoid a directed verdict in a jury trial. *Consolo*, 383 U.S. at 620; *Abaqueta*, 255 F. Supp. 2d at 1024. The court must review the record as a whole and may not disregard contrary evidence in the record. *Kreso v. Shinseki*, 11-CV-02378-REB-MJW, ___ F. Supp. 3d ___, ___, 2014 WL 4436418, *1 (D. Colo. Sept. 9, 2014), *appeal*

*filed,* No. 14-1455 (10th Cir. Nov. 3, 2014). However, if supported by substantial evidence, the decision will be upheld even if conflicting evidence exists or another outcome could be supported by the evidence. *See Consolo*, 383 U.S. at 620; *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004).

Riano contends that the investigation into his actions was "fatally flawed and that these flaws permeated the entire termination process." (Doc. 19 at 20.) He contends that at the hearing he was denied the opportunity to cross-examine witnesses and to present a meaningful defense, and the decision was not supported by substantial evidence. (*Id.* at 20, 28.)

I.      The Decision Accorded with Law and Required Procedures and Rules

Shinseki agrees that before his agency terminates an employee, due process requires that the employee receive notice and an opportunity to be heard as to those charges in a meaningful time and manner. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976); *Cooper v. Salazar*, 196 F.3d 809, 814 (7th Cir. 1999).[3] Due process is flexible and calls for such procedural protections as the situation demands. *Mathews*, 424 U.S. at 334; *Ringquist v. Hampton*, 582 F.2d 1138, 1140 (7th Cir. 1978). Generally, fewer procedural safeguards are required in administrative proceedings than in court hearings. *See Cooper*, 196 F.3d at 814; *see Larry v. Lawler*, 605 F.2d 954, 961 (7th Cir. 1978). The court should evaluate due process challenges by balancing the private interest affected by the official action, the risk of an erroneous deprivation through the procedures used, the probable value of other procedural safeguards, and the government's interest, including the burden that

---

[3]Shinseki apparently concedes that Riano held either (or both) a property right in his employment or liberty interest in not being terminated for reasons that damage his standing or reputation.

additional or substitute procedural requirements would entail. *See Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

Further, in reviewing the agency action the court should assess whether the agency followed its own procedures. *See Morton v. Ruiz*, 415 U.S. 199, 235 (1974). However, although an agency generally must follow its own rules and regulations, this court defers to that agency's interpretation of those regulations, including its procedural rules. *Kreso*, 2014 WL 4436418 at *1; *see Rhodes v. Johnson*, 153 F.3d 785, 789 (7th Cir. 1998) ("We must give substantial deference to an agency's interpretation of its own regulations." (internal quotation marks omitted)).

A.    Rules Concerns—Investigation

Riano contends that the OIG investigation was flawed, failed to follow required procedures, and tainted every step of the VA's decision-making process.[4] Riano focuses on Cossairt's interviews and reports and the failure to obtain sworn statements from patients. Although Riano briefly mentions that Cossairt's questionnaire was "strongly suggestive" (Doc. 19 at 21), he fails to develop any argument about the content of the questionnaires; thus, the argument is waived.

1.    Patient Statements

Riano charges that Cossairt failed to obtain sworn statements from patients, in violation of VA Handbook rule 6(a)(1)(c). At the time of Riano's DAB hearing, VA Directive

---

[4]At least one court has found that procedural due process rights do not apply during an administrative investigation and that administrative rules or regulations do not create due process rights. *Kreso*, 2014 WL 4436418 at *11.

5021, pt. II, ch. 1, § 6.a(1)(c), titled "Determining the Facts" and subtitled "Inquiry and Investigation," provided:

> The resulting information will be documented. Signed statements, preferably under oath, are the best form of documentation, and should be obtained, whenever possible, from employees interviewed. . . . Failure to obtain a signed statement from the employee involved will not, in and of itself, serve to preclude taking the action, particularly where sufficient information is otherwise obtained from the employee, or the nature of the situation makes it impractical or unnecessary to obtain a written statement.

Dep't of Veterans Affairs Handbook 5021, www1.va.gov/vapubs/viewPublication.asp?Pub_ID=231 (last visited Mar. 12, 2015).[5]

After the requirement that investigation information be documented, the remainder of section 6.a(1)(c) is worded as a best practice, not a requirement. Signed statements, preferably sworn, are preferred but not required. Further, the rule expressly concerns signed statements obtained from VA employees, not patients or other third parties. The section indicates that even the failure to obtain a signed (let alone sworn) statement will not preclude disciplinary action if the situation makes it impractical or unnecessary. Plus, the VA could—and in this instance did—consider the patients' questionnaire answers and interviews as well as Riano's statements, in which he did not deny his technique, to be sufficient information. Thus, the VA did not violate the rule by not obtaining sworn statements from patients.

---

[5]Shinseki contends that the various parts of section 6.1(1) discussed here and on the next few pages did not apply to Cossairt's OIG investigation because the rule applies to employee-management matters such as supervisor inquiries, and § 6.a(3)(a)1.a. exempts OIG investigations from the rule. According to Shinseki, the OIG is a separate entity from VA management and is not bound by Directive 5021. This court need not resolve whether the Directive formally applied to Cossairt's investigation. Even assuming it did, the Directive was not violated.

2.  Lack of Interviews of Riano or Jeanine Harvey

Riano charges that Cossairt failed to interview Riano or Jeanine Harvey, who worked

with Riano, in violation of section 6.a(1)(b).  This subpart of VA Directive 5021, pt. II, ch. 1,

§ 6  stated that

> further investigation may be warranted depending on the nature and
> seriousness of the incident (e.g., administrative investigation).  Investigating
> officials will seek information concerning the matter from the employee(s) who
> is alleged to have committed the offense and from any other persons who
> may have pertinent information about the incident(s).

D e p ' t   o f   V e t e r a n s   A f f a i r s   H a n d b o o k   5 0 2 1 ,

www1.va.gov/vapubs/viewPublication.asp?Pub_ID=231 (last visited Mar. 12, 2015).

Cossairt noted that he did not attempt to interview Riano because he was

represented by counsel.  (R. 236.)  Regardless Riano responded orally to the charges

following Cossairt's report and the proposed termination notice, and prior to the initial

termination decision.  Thus, the VA considered Riano's information.  Moreover, Riano and

Harvey testified at the DAB hearing, curing any suggestion that their information was not

considered by the VA before the final decision issued.  In the end, the agency obtained

information from Riano and Harvey as part of the investigation as a whole, irrespective of

whether Cossairt interviewed him before writing the report.

3.  Cossairt's Alleged Bias

Riano charges that Cossairt's investigation and report were tainted by Cossairt's

prejudices, thereby violating his due process rights and VA Directive 5021, pt. II, ch. 1,

§ 6.a(1)(d).  Subsection 6.a(1)(d) states that evidence will be obtained impartially and an

effort will be made to resolve any conflicting statements by developing additional evidence.

14

Dep't of Veterans Affairs Handbook 5021, www1.va.gov/vapubs/viewPublication.asp?Pub_ID=231 (last visited Mar. 12, 2015).

According to Riano, among other things, Cossairt in his interviews referenced homosexuality, prefaced his interviews of patients with his opinion that Riano had committed a crime, and suggested that patients could receive monetary compensation if the report supported wrongdoing. Additionally, Riano points to post-report statements he obtained from various patients in 2010 (before the DAB hearing) as evidence of Cossairt's improper questioning. For example, patient M2 wrote that Cossairt told him what Riano did was illegal and that if Riano was found guilty of the charges, M2 could receive financial compensation. (R. 202-03.) Patient S1 or S2[6] said that Cossairt began his interview by saying that what Riano did was illegal, and S1 or S2 was uncomfortable that Cossairt paid for the veteran's meal. (R. 195-96.)

Further, Riano argues that Cossairt's report skewed the patients' statements about Riano's medical technique into sexually charged language. For instance, Cossairt called patient M2's description of Riano's hand gestures as a "jerk off motion," but M2 says he never referred to the hand gesture that way. (*See* R. 202.) And Cossairt reported that patient A said Riano massaged A's penis using motions similar to masturbation, but A says he never told Cossairt that Riano did those things. (*See* R. 200.) Patient W1 stated that Cossairt's interview process was intimidating. (R. 204.) Consequently, for purposes of this opinion, the court assumes, for argument's sake, that Cossairt spun the patients' more

---

[6]Riano labels this statement as coming from S1 but Shinseki contends that Riano has mislabeled the veteran and that the statement is actually from S2. (*See* Doc. 22 at 14 n.5.)

15

generic words about touch or movement into terminology related to sexual gestures or gratification.

However, Riano raised his concerns about Cossairt's investigation and report before and during the hearing. The patients' statements that he cites as evidence that Cossairt's interviews were biased were in the record before the DAB. (*See, e.g.*, R. 195-96, 199-204, 276-86.) The DAB observed that "[o]n multiple occasions, the appellant's attorney characterized the investigative report at [sic] double hearsay, biased and misleading." (R. 7.) However, the DAB found the report to be reliable.

This court is not permitted to make credibility or reliability determinations afresh in this case. Instead, it reviews the case deferentially. Riano was given the opportunity to challenge Cossairt's impartiality and did so. The DAB's reliability determination that Cossairt's investigation report was impartial was a factual finding, and the court concludes it was based on substantial evidence in the record.

The DAB considered Riano's admissions regarding several of his statements and compared them to the OIG report. (*See, e.g.*, R. 11 (stating that Riano admitted in testimony to using the word "hang" about a patient's penis and comparing the testimony to a similar statement in Cossairt's report).) Riano admitted at the hearing that he treated all of his patients the same and always applied pressure at the base of the penis to increase blood flow. (*See* R. 150, 184.) Further, the DAB compared the report with many questionnaire statements that matched or were similar. Moreover, the DAB found no evidence that the questionnaire was biased or misleading. In addition, Cossairt included in his report statements by or interviews of some patients (T3, K1, S2) who were not included in the charged specifications. Cossairt reported that T3 said Riano never told him

his penis had to be erect for examination and never manipulated his penis to do so. (R. 320.) K1 indicated that Riano manipulated his genitals in a normal manner. (R. 356.) Cossairt reported that G2 said Riano touched him only minimally and in a normal manner; G2 said no staff member said his penis needed to be erect for examination or treatment. (R. 351-52.)

Although evidence in the record exists suggesting that Cossairt may have been partial or began interviews in a slanted manner, there is substantial evidence nevertheless supporting the DAB's finding that Cossairt's report and interview memorandums were reliable. Also, Cossairt did not testify at the DAB hearing, and neither party sought to call him as a witness. (*See* R. 50-53, 467.) The impartiality of Cossairt's report could have been attacked through examination of Cossairt, but that did not occur. The DAB made a reliability decision concerning the report based on the record before the DAB, and substantial evidence supports that decision, even if contrary evidence may also exist.

Moreover, for the reasons set forth below, Cossairt's interviews and report did not taint the overall termination decision. The content of the questionnaires has not been sufficiently challenged, and the handwritten answers from the patients on the questionnaires occurred before the patients were interviewed. Further, the testimony at the hearing (especially that of Riano) was not affected by any of Cossairt's interview techniques.

B.    Due Process Concerns—Hearing

1.    Medical records and names of patients

Riano contends that he should have been given access to the medical records of the veteran patients whose statements were considered by the DAB. On the other hand, the VA points out that the DAB did not consider the medical records of any veteran patients'

medical records and determined that those records did need not to be disclosed to Riano. In this court's view, the DAB was within its authority to deny production of the records. Moreover, the medical records appear to have been immaterial. The charges against Riano involved his technique for examination and treatment, not the actual condition or medical history of the veteran patients. Riano testified regarding his treatment technique and indicated that it was the same for all of his patients. The medical records of individual veteran patients would not necessarily contain evidence regarding Riano's examination technique and treatment. At most the records would have identified the veteran patients referenced in the specification. Moreover, in light of Riano's testimony as to his technique and his statement that he treated all of his patients similarly, the identities of the veteran patients was not of major significance. Thus, individual medical records were not necessary.

   2.   Opportunity to present Riano's witnesses and to cross-examine witnesses against him

Riano contends that he should have been allowed to call as witnesses several veteran patients who wished to testify in his behalf, including some whose written statements were used to support the specifications. Patient M2, for instance, indicated that he would have testified that Riano's examination and treatment for M2's genital lesions were effective and better than any other he had received; Riano did not stroke M2's penis to erection; and Riano was all business during the examinations, with no inappropriate conduct. (R. 276-78.) Yet, M2's statements in his questionnaire and to Cossairt were the basis for Charge I, specification 15. (*See* R. 18.)

VA Directive 5021, part V, ch. 1 contains instructions for processing appeals to the

DAB. At the time of Riano's DAB hearing, section 8 of that chapter stated in pertinent part:

> f. Witnesses. Both the appellant and management will have the right to call witnesses. The Chairperson will, on his/her own initiative, call such witnesses on behalf of the Board as the Chairperson deems necessary. The Chairperson has the final authority to determine the acceptability of any witness.
>
> g. Questioning of Witnesses. The Chairperson will permit the parties to the case to ask questions of witnesses in order to ascertain all pertinent facts and is authorized to exclude irrelevant and/or unduly repetitious evidence. Both sides will have an opportunity to properly present and support their respective positions upon any question or matter presented to the Board for decision.
>
> h. Patients as Witnesses. A patient, with the patient's consent, may be a witness provided there has been a medical determination that the patient has the capacity to testify and that the patient's appearance as a witness will not be detrimental to the patient's health and welfare.

Dep't of Veterans Affairs Handbook 5021, www1.va.gov/vapubs/viewPublication.asp?Pub_ID=231 (last visited Mar. 12, 2015). In a letter sent in advance of the DAB hearing by Chairperson Marilyn Kerkhoff, the DAB said that it would review testimony of proposed witnesses for relevancy, materiality, and repetitiousness (R. 135), but according to Riano none of those issues were addressed in the denial of witnesses.

DAB Chairperson Kerkhoff determined that the witnesses could not testify. Section 8.f., quoted above, gives the chairperson final authority to determine the acceptability of any witness. Thus, the directive permitted the action and no rule was violated by the DAB.

Nor was declination of patient testimony a violation of due process. Kerkhoff exercised this discretion against Riano and the agency. The agency proposed two patients as witnesses, whereas Riano proposed six. All of the patients were disapproved.

Therefore, both sides were treated similarly.  Moreover, the veterans Riano wished to call had provided written statements through their answers in the OIG questionnaires and in the statements and affidavits that Riano points to now.  Those statements and affidavits for the desired veteran patient witnesses were included in the record before the DAB.  (*See* R. 187, 195-204, 258, 279-85.)  Thus, Riano was able to reference the points he wanted those witnesses to offer in person.  Testimony reiterating those statements would have added nothing, and testimony explaining those statements further would have added little.

Riano says he should have been provided the opportunity to confront and cross-examine the informers against him.  Riano does not allege that he was denied the right to cross-examine any witness who testified.  Instead, according to Riano, the DAB based its credibility determinations on the veteran patients' handwritten statements and Cossairt's version of the interviews.  Yet, Cossairt and the complaining veteran patients never testified.  Riano points out that the case against him was based on hearsay and, as to Cossairt's investigation report, double-hearsay, and that he could not challenge the declarants.  However, as will be discussed later in this decision, hearsay can be acceptable in administrative proceedings.  Additionally, the Sixth Amendment right to cross-examine witnesses applies in criminal, not administrative, proceedings.  An employee in an administrative discharge hearing has no absolute right to cross-examine witnesses. *Kreso*, 2014 WL 4436418 at *13; *See Green v. Bd. of Sch. Comm'rs*, 716 F.2d 1191, 1192-93 (7th Cir. 1983); *Ringquist*, 582 F.2d at 1140.

In *Richardson v. Perales*, the Supreme Court concluded that written reports by physicians could be received as evidence in a Social Security hearing and used as substantial evidence to deny benefits despite their hearsay character and an absence of

cross-examination of the physician, even in the face of opposing evidence and testimony. 402 U.S. 389, 402 (1971). Among other reasons relied upon by the Court, the physicians were identified and were not shown to have been biased, the claimant did not subpoena the physicians to testify, and the medical reports are generally recognized as reliable records. *Id.* at 402-05.

In *Ringquist*, an Internal Revenue Service employee argued that the government's use of seventeen taxpayer affidavits in administrative proceedings before the U.S. Civil Service Commission violated his due process rights of confrontation and cross-examination. 582 F.2d at 1140. However, the Seventh Circuit found no due process violation because federal regulations suggested that witness affidavits could be used, the employee challenged the reliability of the affidavits before the commission, the affidavits did not contradict the employee's defense theory and explanation of his actions, and the employee did not actively seek the taxpayers' testimony. *Id.* at 1140-41 & n.6.

In *Green v. Board of School Commissioners*, a school-bus driver challenged his dismissal on charges that he sexually harassed girls who rode his bus. He maintained that his pre-termination hearing was inadequate because it rested on handwritten statements of ten children. Although Green was allowed to see the statements, the identities of the children were withheld and the children did not testify at the hearing. 716 F.2d 1191, 1193 (7th Cir. 1983). The Seventh Circuit found no due process violation ruling:

> The School Board had good reason to keep the identity of the children secret. They were frightened of Green and by the thought of having to recount to a roomful of strangers the occasion when Green had grabbed or touched their breasts and legs or attempted to lie on top of them in the back of his bus. There is no chance that all the children fabricated their stories for fun or because they dislike Green because each child gave her statement to a police investigator employed by the School Board and was interviewed

21

> individually to avoid the risk of collusion. Also each recorded her story in her own words. The statements reflect this: the same phrases and stories do not reappear in each. And each child's statement was signed by one of her parents who reviewed it in the presence of the child and the investigator. These procedures adequately protected Green against any risk that the children were out to get him.

*Id.*

Riano points to *McNeil v. Butz*, in which two Department of Agriculture employees were terminated following administrative decisions based in part on investigatory reports. 480 F.2d 314 (4th Cir. 1973). The government-prepared reports described incriminating evidence but included no sworn statements or the identity of those who accused the employees of misconduct. The employees were not given the reports prior to their initial hearings but received excerpts of the reports prior to their appeal hearings. *See id.* at 317-18. Neither was permitted to examine or call the accusers as witnesses. *See id.* at 317-18.

The Fourth Circuit mentioned the significance of the right to confront and to cross-examine adverse witnesses, especially in a setting where decisions turn on questions of fact. *Id.* at 321-22. According to the court, "it is even more important where the evidence consists of the testimony of individuals whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." *Id.* at 322. The court found that one of the two employees should have been provided a hearing at which she could confront witnesses. She denied the allegations against her and the government's case was based only on the investigative reports. *Id.* at 326. On the other hand, the court concluded that the other employee was not entitled to a new hearing. because he made admissions that were sufficient to support his dismissal; confronting his accusers would not have helped him. *Id.*

22

Riano cites *Walker v. United States* as well, in which the Tenth Circuit stated that a government employee terminated for making a false statement should have been allowed to confront and cross-examine his accusers before an impartial tribunal. 744 F.2d 67 (10th Cir. 1984). There the government claimed that the dishonesty charge was based on statements of a former employer but did not disclose who made the statement. Further, the employee had a minimal hearing before the same office that terminated him. *Id.* at 70-71.

Taking this caselaw into account, this court finds that Riano received due process notwithstanding that he could not call and question the veteran patients whose statements resulted in the specifications. Here, Riano is like the male employee in *McNeill*. His own testimony provided confirmation or corroboration of his treatment technique. Regardless of whether the veteran patients were accurate as to lengthy stroking of their penises and whether Riano manipulated them to a partial or full erection, Riano's own testimony confirmed that he pressed on the veteran patients' penises to increase blood flow and firmness. And he admitted using corpsman language with patients. Hence, Riano fails to persuade this court that confrontation and examination of the veteran witnesses would have altered the hearing result in any way.

The present situation follows that in *Green*. The veteran patients independently wrote their answers to the questionnaire (before talking with Cossairt) in their own words, reducing any chance that the statements were conspiratorial or fabricated. Further, the writers were identified when they made their statements, even though the names were not given to Riano. And like the employee in *Ringquist*, Riano brought his concerns about reliability of the statements and interview reports to the DAB's attention.

## II.    Substantial Evidence Supports the Decision

As set forth above, "substantial evidence" means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion—more than a scintilla, but less than a preponderance.  And if supported by substantial evidence, the decision will be upheld even if conflicting evidence exists or another outcome could be supported by the evidence.

Hearsay may constitute substantial evidence if relevant and material, but the court should consider:

> (1) the independence or possible bias of the declarant, (2) the type of hearsay material submitted, (3) whether the statements are signed and sworn to as opposed to anonymous, oral, or unsworn, (4) whether the statements are contradicted by direct testimony, (5) whether the declarant is available to testify and, if so, (6) whether the party objecting to the hearsay statements subpoenas the declarant, or whether the declarant is unavailable and no other evidence is available, (7) the credibility of the declarant if a witness, or of the witness testifying to the hearsay, and finally, (8) whether the hearsay is corroborated.

*Lerner*, 2013 WL 5592906, at *6 (quoting *R.P. Carbone Constr. Co. v. Occupational Safety & Health Review Comm'n*, 166 F.3d 815, 819 (6th Cir. 1998)).  There is no blanket prohibition of administrative reliance on hearsay. *Richardson v. Perales*, 402 U.S. 389, 407-08 (1971).

Riano charges that "[n]o one who directly observed Riano's practices testified" at his hearing.  (Doc. 19 at 28.)  He contends that the only evidence consisted of the statements Cossairt said veteran patients made, which were double-hearsay.  (*See* Doc. 19 at 28-29.)

However, the evidence consisted of more than simply Cossairt's investigation report.  For most of the specifications, the DAB relied heavily on the veteran patients' handwritten statements and the testimony at the DAB hearing—often Riano's own testimony.

24

The veteran patients' answers on the questionnaire were relevant, material, and reliable to an acceptable degree. Even though Riano says Cossairt tainted his interviews, the questionnaires appear to have been completed by the veteran patients prior to those interviews. The veteran patients were independent, and Riano suggests the veterans held no bias before Cossairt interviewed them. The statements were handwritten by identified individuals. There was no basis for questioning the credibility of the declarant veteran patients prior to Cossairt's interviews, and much of the hearsay was corroborated by other hearsay statements and, importantly, some of Riano's testimony.

Ample evidence outside of Cossairt's report supported the DAB's findings and decision. In this court's opinion, even with the exclusion of Cossairt's report, no question exists regarding substantial evidence as to most sustained specifications.

For instance, as to Charge I, specification 1, Patient M1's statements to police (not Cossairt), described his appointments with Riano. (R. 240-52.) Riano agreed during testimony that M1 told Riano that if he pulled on the penis again, "'you're going to get something that you're not expecting.'" (R. 633.) Riano did not deny pulling on M1's penis and admitted to applying Nivea to his veteran patients' penises. (R. 631, 633.) Riano's admissions during testimony provided substantial evidence to sustain this specification.

Charge I, specification 2, alleged that Riano manipulated H1's penis and told H1 that it was standard procedure from the Center for Disease Control (CDC). Although the DAB decision pointed to Cossairt's report regarding how H1 was treated by a previous provider, the DAB pointed to H1's handwritten statement that Riano's behavior was inappropriate and that Riano mentioned several times that what he was doing was standard procedure per the CDC. The DAB pointed out that Riano never produced CDC guidelines during the hearing

25

and that when the DAB reviewed the CDC guidelines they found nothing to support Riano's statements about his examination technique or treatment other than one sentence stating that warts on moist surfaces respond better to topical treatment than do warts on drier surfaces.  (R. 6-7.)  H1's handwritten statement was several pages long and discussed Riano's treatment technique of touching and rolling H1's penis in his palms to get blood in the shaft.  (R. 304-12.)

Regarding Charge I, specification 3, the DAB specifically pointed to patient G1's handwritten statement that Riano "would stroke my penis and said he needed to have it somewhat erect."  (R. 8.)  G1's handwritten answer on the questionnaire read that Riano "would stoke [sic] my penis, said he needed to have it some what erect so he could make sure there was no small warts that he could not see when it was normal size."  (R. 317.) Regarding Charge I, specification 4, in addition to Cossairt's report, the DAB relied on Riano's testimony that he did apply Nivea cream to the shaft of the penis and that he told his veteran patients he "would be pulling out on the penis."  (*See* R. 619.)  The DAB cited veteran D1's handwritten statement that "Jim told me he needed to make my genitals semi-hard to examine them" as a basis for sustaining specification 5.  (R. 9.)  D1's handwritten answer on the questionnaire supports the DAB's finding, as D1 stated:  "Jim told me he needed to make my genitals semihard to examine them.  I took his word for it the first time . . . Later, he did it again and I felt uncomfortable this time."  (R. 331.)  The DAB credited the statement because this veteran patient's reporting of certain comments by Riano were similar to comments reported by another veteran patient.

For specification 6, the DAB pointed to Riano's testimony the his technique included pulling out on the penis or to engorge the penis with blood.  (R. at 621, 629.)  The DAB

sustained specification 8 based upon veteran W 1's handwritten statement that his genital area was manipulated to achieve blood flow, plus Riano's testimony that he applied pressure to the base of a patient's penis and engorged the penis with blood. (*See* R. 343 ("My gential [sic] area was manipulated, to achieve blood flow, but the staff member who did this was always proffesional [sic] about it.").) As to many remaining specifications, even if the DAB relied on Cossairt's memorandum in part, it relied on the veterans' questionnaires and Riano's testimony as well.

In sum, multiple specifications were sustained based on the testimony at the DAB hearing and on the handwritten questionnaire answers of Riano's veteran patients. Riano did not deny his treatment technique, veteran patients' statements (unaffected by later interviews by Cossairt) described how Riano conducted his examinations and treatment and how Riano said the CDC guidelines called for using his engorgement technique, various witnesses testified that Riano's technique was not standard or advisable, and CDC guidelines did not recommend the technique as Riano claimed. Reviewing the record as a whole, substantial evidence existed to support Charge I.

To the extent Riano takes issue with the DAB's characterization of his manipulation of patients' penises as "being similar to masturbation" (R. 4), or the use of the word "erection" instead of "engorgement," the matter is one of semantics in this appeal. Regardless of whether the language used by the VA in its decision could connote some sexual basis for the stimulation, Riano admitted to his engorgement technique, and the VA determined that the technique constituted inappropriate manual manipulation of the male veterans' genitals.

Similarly, the DAB's decisions as to Charge II, specifications 2 through 6, 8 through 10, 13, and 14 rely on veteran patients' handwritten statements and Riano's testimony, even if the DAB mentioned Cossairt's report as well. For instance, Riano testified that he used terms (such as "cock," "dick," "tool," "balls," or "dick doctor") the veteran patient used, with the purpose of making the veteran patient comfortable. (R. 24-26 (citing Hr'g Tr. at 278, 280).) Although Riano denied initiating conversation that way, he admitted that he used them depending on how the veteran spoke. (*Id.*) But some evidence suggested that Riano used the words more freely than he testified. Patient H1's handwritten statement contained the following: "As he was looking at and touching my penis and scrotum, he kept referring to them in unprofessional slang as my "cock, dick, shaft, tool, sack, balls, etc." which I felt was rude, unappropriate [sic] and extremely unprofessional." (R. 304-05.) And even if Riano did not initiate such terminology, witness Murphy testified that a registered nurse is not trained to speak that way to patients. Under the present deferential review standard, the DAB was entitled to determine that the use of such terms was unprofessional and unacceptable. As stated by the DAB,

> [a] significant factor the Board found was the appellant's inability to distinguish his training and actions as a corpsman (with no professional licensure or training) from that of the professional licensed registered nurse. . . . His justification of language and practices as a corpsman that carried into his practice as an RN was of great concern to the Board. . . . His training as a Navy corpsman in the treatment of genital warts and the acceptance of the use of crude slang terms, is not [sic] excuse for this behavior to have continued after he received training as a Registered Nurse and in his practice as a nurse in the Department of Veteran Affairs Medical Center.

(R. 33.)

Further, many of the DAB's decisions as to the Charge II specifications were based on a credibility determination, to which this court defers. The DAB disbelieved Riano's

28

denials as to several alleged comments because he admitted that he used some of the terms in question and because of the similarity of the statements by multiple veterans. (*See, e.g.*, R. 26.) For instance, the DAB found Riano not credible as to his denials of alleged statements commenting on patients' "nice skin down there" because Riano testified that many of his patients had dry penile skin and admitted that he discussed the matter with them. (*See, e.g.*, R. 26 (citing R. 631).) Indeed, patient D1's handwritten statement included that Riano told him he had "nice skin there, really smooth." (R. 331, *cited at* R. 26.) The DAB found Riano not credible regarding his denials of questioning patient F1 about how a penis piercing felt during sex and masturbation. The DAB pointed to apparent selective memory regarding what Riano recalled and the similarity of "statements in [the veterans'] own handwriting and not simply in the summary of the OIG investigator." (R. 28.)

The similarity of the veteran patients' questionnaire statements caused the DAB to discount Riano's credibility as to the several specifications charging Riano with unprofessional comments about another patient. Several specifications charged Riano with telling veteran patients that another patient had said "Jim, if you do that one more time, I'm going to ejaculate" and/or that the patient did ejaculate. Riano admitted that M1 patient had said that to him, but denied during testimony that he had told other patients about it. The DAB said that the fact several veteran patients reported the statement provided evidence that the veterans, not Riano, were credible on the matter.

Regardless of whether Riano's use of corpsman terminology was meant to put veterans at ease and whether other witnesses (e.g., Jensen and Bigelow) sometimes used crude terminology, the VA determined that such language was unprofessional in the VAMC setting. It is not this court's role to second-guess that personnel decision.

Because any one specification results in a charge being proved, Riano's arguments even as to any specification based solely on Cossairt's report would not alter the outcome.

C.     The Decision Was Not Arbitrary or Capricious

Riano did not expressly argue that the DAB's decision was arbitrary or capricious. (*See, e.g.*, Doc. 19 at 21, 24, 28 (referencing procedures, due process, and substantial evidence issues).)   But for completeness, the court concludes that the decision met the required standard.

For arbitrary-and-capricious analysis, the reviewing court must determine "whether the agency examined the relevant data and articulated a rational connection between the facts found and the decision made." *Olenhouse*, 42 F.3d at 1574 (footnote omitted); *Kreso*, 2014 WL 4436418 at *2.  Agency action will be set aside if the agency relied on factors that Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *Olenhouse*, 42 F.3d at 1574; *Kreso*, 2014 WL 4436418 at *2. Under this highly deferential standard, the administrative decision is neither arbitrary nor capricious if the agency's path may reasonably be discerned.  *See Bagdonas v. Dep't of Treasury*, 93 F.3d 422, 425-26 (7th Cir. 1996).

There is no question in the court's mind that the DAB examined the relevant data and articulated a rational connection between the facts found and the decision made.  The DAB's decision reveals an extensive analysis of Riano's case.  No impermissible factors were considered, the agency did not fail to consider an important aspect of the matter, the agency decision comports with the evidence, and the decision was not in any way

implausible. Riano admitted that his treatment technique involved touching the penis to encourage blood flow and at least slight straightening of the penis, and evidence before the DAB provided a basis for finding that Riano's procedure was not an appropriate technique at the VA clinic. Similarly, Riano admitted to the use of crude language, and evidence before the DAB provided a basis for finding such language unprofessional. The DAB considered contrary evidence, such as that some of Riano's patients did not feel violated. (*See, e.g.*, R. 11 ("Another Veteran wrote in his handwritten OIG Questionnaire that 'it wasn't like the staff member was simulating masturbation. It was done to get the blood flowing in your genital area.[']  This Veteran did not feel violated, nor did that patient complain."), *id*. ("The patient stated [in his handwritten statement on a questionnaire] he did not feel violated and understood this to be in his best interest.").)  But it then came to a reasoned conclusion that was neither arbitrary nor capricious. The DAB's rationale in its thirty-five page decision is rational and readily discerned.

CONCLUSION

For the reasons set forth above,

IT IS ORDERED that the decision of the agency is affirmed.

Dated at Milwaukee, Wisconsin, this 24th day of March, 2015.

BY THE COURT

/s/ C.N. Clevert, Jr.

C.N. CLEVERT, JR.
U.S. DISTRICT JUDGE